SCOTT v. DEVLIN et al.

(District Court, S. D. New York.   September 15, 1898.)

BANKRUPTCY—CLAIM IN LITIGATION—FRAUDULENT ASSIGNMENTS—ASSIGNEE'S CLAIMS UPON THE FUND RECOVERED—CHARGES THEREON—STATUTE OF LIMITATIONS.

Upon D.'s bankruptcy in 1878, a large claim in a suit brought by the bankrupt 15 years before and then pending had been assigned some time previously to his son C. Shortly after D.'s discharge, he took a reassignment of the claim to himself from C.'s administratrix. Both transfers were without any pecuniary consideration. D., and after his death, his representatives, continued the litigation until 1895 when the fund was recovered by D.'s administrator. Upon a bill filed by D.'s assignee in bankruptcy, *held*, that both transfers of the claim were without consideration and void as to creditors; that the assignee was entitled to the fund remaining, subject to the payment of the proper claims and allow-

ances in favor of those who had prosecuted, preserved and collected the fund. *Held* (2) that the two-years statute of limitation did not begin to run until the fund was realized.

Wm. Ford Upson, for complainant.

E. C. Cronin, for defendant Devlin.

Cardozo Bros., for defendants Tully and others.

T. C. Campbell, for defendant Knaak.

BROWN, District Judge. The bill of complaint in this action was filed on April 13, 1896, to reach a fund of $23,531.56, received by the administrator of Charles Devlin, deceased, in July, 1895, and $1,800 still remaining with the comptroller, the proceeds of a final judgment obtained by the administrator on June 14, 1894, against the mayor, aldermen and commonalty of the city of New York in the court of common pleas for a claim under the Hackley street-cleaning contract, which had been in litigation since the year 1864. The funds in question represent a one-eighth interest which at the time of the commencement of that suit belonged to Charles Devlin. An assignment dated December 30, 1874, purports to assign all his interest in this claim to his son Charles P. Devlin, who afterwards died on June 1, 1878. His widow, now Mrs. Knaak, one of the defendants, became his administratrix.

In August, 1878, Charles Devlin filed his petition in bankruptcy in this court. He was adjudicated a bankrupt on August 31, 1878, and on or about November 30, 1878, assigned his property and estate to John H. Platt, his assignee in bankruptcy. Mr. Devlin was discharged as a bankrupt on May 9, 1879, and died intestate in 1881. The Hackley litigation was continued in the name of his widow Mary Devlin, his administratrix, and afterwards in the name of his son John B. Devlin as administrator.

On May 20, 1879, 11 days after Charles Devlin's discharge in bankruptcy, the defendant Mrs. Knaak as administratrix of Charles P. Devlin "for value received and in consideration of one dollar" executed a retransfer of the Hackley claim to Charles Devlin, with whom she and her family were then living. She testifies that though the signature to this instrument is hers, she never knowingly made such a transfer, or intended to make such an assignment; that no consideration was ever received for it; that at Mr. Devlin's request she signed several papers, of some of which she did not know the contents, but which she understood were to facilitate his discharge in bankruptcy; and that she has never ceased to maintain that she as administratrix of her deceased husband is entitled to the fund in question, and did not know until recently that such an assignment as this existed. Mr. Platt died August 21, 1886, and on June 20, 1889, the plaintiff was appointed assignee in bankruptcy in his place.

The complaint alleges that the transfer from Charles Devlin to his son was made without consideration, was in fraud of creditors, and was never in fact delivered to Charles P. Devlin, and that the administrator is irresponsible, and prays an injunction against the distribution of the fund, and general relief. The original answer of Mrs. Knaak as administratrix, avers the validity of the transfer to

her husband, but denies the retransfer by her to Charles Devlin. By an arrangement made since this suit was commenced, she has transferred her interest to the plaintiff in this action, upon his agreement to share with her whatever may be recovered in it. The answers of the other defendants, the administratrix and heirs of Charles Devlin, the father, affirm the validity of both transfers, deny all fraud, set up the statute of limitations, and further deny the jurisdiction of this court to award any relief based upon the transfer by Mrs. Knaak to the assignee, in case the re-assignment by her to Charles Devlin should be found to be invalid.

Upon the referee's report on the first hearing in Charles Devlin's suit against the mayor, etc., prior to 1874, the judgment entered was for about $500,000, of which Mr. Devlin's one-eighth interest was $63,698.55 as specified in that judgment.

In November, 1874, this judgment was reversed by the general term of the court of common pleas. 48 How. Prac. 457.

On October 5, 1875, the judgment of the common pleas was reversed by the court of appeals and a new trial ordered. 63 N. Y. 8. The opinion delivered in the court of appeals established the right of the plaintiff to recover the unpaid installments earned under the Hackley contract, as well as damages for the termination of the contract by the city. After successive references to Mr. Waterbury, Judge Leonard and Mr. Bloomfield, and much litigation on interlocutory orders, the cause was finally referred to Abram Wakeman in July, 1880, upon whose report dated August 10, 1888, judgment was entered in the court of common pleas on the 16th day of April, 1891, for about $576,000, of which the sum of $72,003.45 with interest from August 10, 1888, was adjudged to John B. Devlin, as administrator of the estate of Charles Devlin, deceased, for his share of the claim and damages.

On June 5, 1893, the judgment last named was reversed by the general term of the court of common pleas (23 N. Y. Supp. 888), unless the parties thereto should stipulate to reduce the recovery to $250,297.50. An appeal was again taken to the court of appeals; but before the hearing of the second appeal in that court, the parties in interest, under stipulations between them, executed to the mayor the required releases and accepted in satisfaction the residue of the sums awarded by the judgment less 10 per cent. The administrator's share of the sum thus accepted amounted at the time of entering the final judgment on these stipulations on the 14th day of June, 1894, to $24,826.21. The judgment last named made separate provision for the payment of the fees, costs and expenses of the various counsel who had been engaged in the cause, and who, it is alleged, had borne the expenses of the litigation from the beginning. Upon the present hearing the entire record prepared for the court of appeals upon the last appeal has been submitted, together with the proceedings in bankruptcy and much other evidence.

Upon this evidence, I am satisfied that the delivery of the assignment by Charles Devlin to his son Charles P. on December 30, 1874, is sufficiently proved. There is no proof however, of any substantial pecuniary consideration for it. On its face it does not

import any, and the circumstances indicate that there was none. The essential questions on the merits of the case are as respects the validity of this assignment, and of the reassignment to the father made by the son's widow on May 20, 1878, 11 days after the father's discharge in bankruptcy. There is considerable confusion, inconsistency and contradiction in the evidence on these subjects; but upon the whole evidence it seems to me clear that the father's assignment to his son was invalid as to creditors, whether it be regarded as made in trust for the father's future benefit, or as a gift to the son, or as a provision for the latter's family. There is a little evidence in support of the latter view, but Mr. Devlin was not at that time in a pecuniary situation to justify such a gift as against creditors; and the dealings and conduct of the parties both prior and subsequent, affording the most persuasive evidence of the truth, indicate as the most probable and charitable conclusion that the assignment to the son was never intended to make the Hackley claim the son's bona fide property, but was designed for the father's future use and benefit.

1. The evidence indicates that the son was accustomed to hold in his name more or less of the father's business interests; and some of these Mrs. Knaak says had not been reassigned to the father at the time of the son's death.

2. His son John testifies that prior to the father's petition in bankruptcy, the father desired Charles to take an assignment of the Hackley claim and hold it for the father's benefit, and that Charles refused to do so. This witness is certainly mistaken as to the time of the transaction referred to, which is not surprising, considering that it was over 20 years ago; and the cross-examination shows that the subject of the proposed assignment may not have been the Hackley claim. But the witness is unshaken in his conviction and testimony as to the occurrence of a transaction of this nature; and this assignment by the father does not state any substantial pecuniary consideration, but only "one dollar and natural love and affection and other valuable consideration."

3. When this assignment was made the father's pecuniary troubles were gathering. He was largely indebted. He had much property in houses and lands, but it was heavily incumbered. He testifies that at that time property had "begun to fall" and was "beginning to go out of his hands," and that he "borrowed from everybody that he could to keep his lands and houses." From Mr. Macklin, his brother-in-law, he borrowed largely at that time upon notes that were only paid by preferential transfers of real estate shortly before his petition in bankruptcy.

4. The depression in property grew worse, and three years and a half afterwards, in the summer of 1878, when he filed his petition in bankruptcy, his schedules showed no assets of value, but debts to the amount of about $150,000, many of them running back 10 years or more. In the previous spring he had deeded what property remained to him of some possible value over the incumbrances on it besides the transfers above referred to, to his sister-in-law, and to his sons John and Joseph and to his counsel, Judge Car-

dozo. The result indicates that at the time of the assignment, his condition was one of threatened insolvency, proved to be actual by subsequent events.

5. During the three years and upwards that the son held the assignment of the Hackley claim, it does not appear that he ever exercised any actual control over the claim or fund, or in the direction of the litigation; or that he took any steps to that end. He gave no notice of the assignment to the city authorities, nor was he substituted as plaintiff; and from the testimony before Mr. Wakeman by Mr. Marrin, who was at that time the plaintiff's attorney, it is evident that during these three years the son was not known to him in the matter and was not recognized in the Hackley litigation. The assignment was not shown to his wife during his life, and I am satisfied from her statements that she knew nothing of it until it was found in her husband's desk and handed to her a few days after his death, by his brother Joseph. It was practically a secret, dormant assignment of the naked legal title without any substantial consideration; and the inference is strong that it was upon a secret trust for the father's benefit. This inference is strengthened by the subsequent dealings.

6. Immediately upon the son's death by suicide on June 1, 1878, the father told Charles' widow, as she testifies, that the Hackley claim was not hers nor her husband's. "He said, it was not mine; it was not your husband's, and you have no claim to it." He desired her to assign the claim to his son Joseph, evidently not for Joseph's benefit, but for his own, the father in consequence of his insolvency not then being able to take and hold it. It is not improbable that the claim was then assigned to Joseph, as both of them have testified that it was, and that the instrument was held by the father or his counsel; if so, it was afterwards suppressed. Whether this was so or not, the father, soon after the son's death on June 1, 1878, filed a petition in bankruptcy, and having obtained his discharge in May following (1879) procured, 11 days afterwards, as above stated, a direct reassignment of the claim to himself from the administratrix. It is evident that there was no adequate consideration for this assignment. Joseph's vacillating and contradictory testimony about money passing at the time, I discredit. Mrs. Knaak's testimony in contradiction of Joseph's was competent, and shows that there was no consideration at all. The assignment itself states none, except "value received and the payment of one dollar." Had this been a bona fide purchase from the administratrix of a claim that was the bona fide property of the son, the assignment would naturally have stated something more than such a nominal consideration. The father, moreover, having been just discharged in bankruptcy, could not presumptively, or honestly have had the means for fairly purchasing a claim which under the decision of the court of appeals in 1875, was apparently then worth from $30,000 to $60,000. The evidence is conclusive that he paid nothing for the reassignment. Mrs. Knaak says this claim was then the chief thing remaining. Judge Cardozo was then the counsel of the administratrix as well as of the father. The body of the

reassignment is all in his handwriting, which I recognize, showing his personal management of this business. The widow had five young children to support, and but little other means. Had this large and valuable claim been the bona fide property of her husband and really a part of his estate in her hands, it is incredible that Judge Cardozo would have thus betrayed and despoiled one client for the benefit of another, or have been instrumental in such an act of robbery of the son's estate, even if the father was capable of it. Judge Cardozo was, moreover, too good a lawyer not to know that such an act of waste of the son's estate, if the property was equitably the son's, would in the end be held void and ineffectual, and that the Hackley fund from the moment of its recovery by the father or his legal representatives under such a reassignment would stand charged in equity with a trust in favor of the son's next of kin. Smith v. Ayer, 101 U. S. 320; Colt v. Lasnier, 9 Cow. 320.

7. To my mind the conclusion from all these circumstances is irresistible, that Judge Cardozo and all parties at that time understood and knew that the Hackley claim was not really any part of the son's bona fide estate, but had been held by Charles in trust for his father, as other business interests had been held by him, and that the legal title and ownership of that claim ought, as between them, to go back to the father as soon as he was in a situation to take it. All that was done falls in naturally and consistently with this view, and with no other. The father shortly after the son's death filed his petition in bankruptcy; in a few months he obtained his discharge, and then took the reassignment under the management of the counsel for both parties. On the assignment and on the reassignment, nothing was paid or received by either party. The rights of creditors were disregarded, and were no doubt designed to be evaded from the time of the original assignment. The bankrupt's extremely brief examination on that subject in the bankruptcy proceedings gives it no additional credit. Plainly there was no endeavor or intent to probe that matter. I think Mrs. Knaak at the time of the reassignment, assumed that this claim was really the father's. She is a woman of superior intelligence, and it is not credible that she would have assigned this claim to Mr. Devlin after her husband's death, without knowing what she was doing or without adequate consideration if she then believed it had been really and equitably her husband's. Her present belief that she always deemed and claimed the Hackley case to be hers, is, I think a subsequent mental growth. There was no contemporaneous claim or act of hers indicating such a belief at that time, but the contrary. Her assignment to her father-in-law could not have been filled up after she signed it as she now imagines and testifies. About three months afterwards she made, as I have no doubt, the affidavit in Mr. Cardozo's office, dated August 23, 1879, which she now denies, to the effect that she had assigned the claim to her father-in-law. These things she no doubt afterwards mostly forgot; but the small impression they made upon her memory and the little attention she gave them at the time,

indicate that she then conceived herself to have only a family interest in the claim and its prosecution, and not any just ownership of it through her husband's nominal legal title.

8. On November 17, 1878, a stay of proceedings on the city's application was granted in the suit of Devlin against the mayor until the assignee in bankruptcy should be made a party. This shows the current doubts of the good faith of the father's assignment to his son Charles. If its good faith could be made clear, there was no sound reason for any obstinate resistance or delay of the suit to prevent the assignee in bankruptcy from being made a party. But the application was not only opposed by Mr. Marrin, who was up to that time the plaintiff's counsel and who during these several years had not known or heard to whom the bankrupt had assigned the claim; but after the order was granted and entered, no steps were taken to make the assignee a party defendant; and rather than do so, the plaintiff submitted to a stay of the suit for nearly a year, until October 10, 1879, when Mr. Devlin, having in the meantime been discharged in bankruptcy and procured the reassignment from Mrs. Knaak, obtained through Mr. Newcombe his substituted attorney on his own and Mrs. Knaak's affidavits, a vacater of the stay and thereafter proceeded diligently with the litigation. The recital in this order of a disclaimer of any interest by the assignee in bankruptcy is mere hearsay, as he was never made a party to the suit, and the state court never acquired any jurisdiction over him. The recital is denied by the testimony of Mr. Theall and it has no binding force in this action.

9. After Mr. Devlin's death in 1881, when his widow as administratrix was substituted as plaintiff, Mrs. Knaak claimed some interest in the direction of the litigation, and being repulsed, in succeeding years she repeatedly sought information as to her rights, as she says, at Judge Cardozo's office, and from Mr. Marrin and from other attorneys, but could never obtain any satisfaction. By other attorneys she was told to wait; but at Judge Cardozo's office, though at last told that she had assigned her interest, the assignment though held by them, she says, was never shown to her, and she disbelieved it. This reticence and failure of explanation upon a critical subject, shows that the intent in obtaining the reassignment from her was to restore the claim to the father as the proper owner of it, and not that he should hold it for the benefit of the son's family; and, as I have no doubt, for the reason that they knew that the son's estate had no just claim to it, as above stated.

10. The entry in Mr. Devlin's business journal relating to his assignment to Charles, is not I think competent evidence in this suit against the assignee in bankruptcy; and if admissible it would have very little weight. It is in Mr. Devlin's handwriting, in lead pencil, written in a blank space at the bottom of the page closing the business entries for the year 1874; a mode of entry permitting its use, or its obliteration, as might best serve subsequent occasions. On its face it shows that it was not a contempora-

neous entry, but a statement subsequently written there concerning a past transaction. The date ascribed to the assignment is erroneous, and the entry reads in the past tense; when or how long after the transaction the entry was made is not known. By its terms also it is inconclusive, and of little aid to the defendants. It states that the assignment to Charles was "made on certain conditions"; what those conditions were is not stated; they might be such as to defeat the operation of the instrument altogether, and the very statement of "certain conditions" imports that the assignment might be defeated if the conditions were not observed. No consideration is referred to, which in a business journal is a strong indication that there was none. The entry ends as follows: "This assignment intended to save all family misunderstandings in case of my death, and without reservation except that Charles P. Devlin has no claim on my life insurance." This clause would indicate not only a pure gift, but a conditional gift only; and that the son's survival of the father was one of the "conditions"; if so, the defeat of that condition would defeat the assignment. But as I regard this entry as incompetent, it is unnecessary to consider it further.

11. It is urged that the two-years statutory limitation (Rev. St. § 5057) precludes the assignee from maintaining this action, as well as the six and ten years limitation under the state statutes. But I do not think these statutes apply to a case of this kind until the fund is collected. The bankrupt, as I have found, had assigned this unliquidated and disputed claim for damages to his son without consideration and in fraud of creditors; and in less than six months after the appointment of the assignee in bankruptcy he had repossessed himself of the claim. The two assignments, so far as concerns the bankrupt's creditors are virtually parts of one transaction, which being void as to creditors, are to be treated as one. A void assignment is as no assignment. As respects the rights of creditors and of the assignee in bankruptcy the assignment and the reassignment are to be disregarded as though they had never existed and as though the bankrupt had never been out of possession. The United States statute (section 5057) applies only to adverse claimants other than the bankrupt. Clark v. Clark, 17 How. 315, 321. Here there is no such other claimant; but only the bankrupt himself or his legal representatives. This action is virtually for money had and received to the assignee's use, but brought in equity to prevent distribution by an irresponsible administrator. This cause of action did not accrue until the money was received by the administrator in July, 1895, only about nine months before this action was commenced. There was no need of any action to set aside the fraudulent assignment to the son, because the reassignment to the bankrupt himself left no outstanding claim, and the bankrupt's own title could not be improved by the son's fraudulent holding of the title. Any action by the assignee earlier than the present would have been therefore unnecessary and useless. The situation is legally the same as though Charles Devlin had lived and had himself collected and

89 F.—62

received this fund. The law vested Mr. Platt the assignee in bankruptcy in 1878 with the title to this demand against the city; and no doubt the assignee might then have taken upon himself the burden of the litigation and recovery, by instituting a suit therefor against the city and others as defendants. But the assignee owed no duty to the bankrupt to adopt that course; and the bankrupt having soon obtained a reassignment to himself and continued the litigation and collected the money, but according to the evidence without expense to himself, takes the proceeds for the assignee's use, because the assignee has in law all the time held the rightful title to it by virtue of the assignment in bankruptcy. Had the bankrupt inserted this Hackley claim in his schedule of assets, and had subsequently collected it, just as has now been done, the assignee's right to it would not be disputed. But the bankrupt's fraudulent transfer and consequent omission of the claim from his schedule, add nothing to his legal title to it, nor diminish the rights of the assignee in bankruptcy; nor was it necessary that the assignee in bankruptcy should either commence a suit or become a party to the suit against the city then pending in the one case more than in the other, whether the assignee had knowledge of the facts or not. The numerous authorities cited by the defendants as respects the statute of limitations all have reference to actions against persons other than the bankrupt or his representatives who are in adverse possession of property which the assignee seeks to regain; a situation wholly different from the present. Here there has never been any adverse possession in fact; and the bankrupt having repossessed himself of the nominal title with which he had parted in fraud of creditors, and collected the claim, is to be regarded as always in possession. The statute did not begin to run I think until the fund was received, and it had not expired when this suit was commenced.

Decree for the complainant.