MID–STATES INSURANCE COMPANY, a corporation, Plaintiff, The Anglo California National Bank of San Francisco, a national banking association, Plaintiff in Intervention,

v.

AMERICAN FIDELITY AND CASUALTY COMPANY, Inc., a corporation; The American Plan Corporation, a corporation; Mark Hart; Joseph Lotz; Ralph L. Smead; L. Sudekum; John Will; First Doe; Second Doe; Third Doe; Fourth Doe; Fifth Doe and Sixth Doe, Defendants and Third-Party Defendants.

Civ. Nos. 31496, 31311.

United States District Court
N. D. California, S. D.

Oct. 12, 1954.

Wallace, Garrison, Norton & Ray, San Francisco, Cal., Lewis Schimberg, Chicago, Ill., John R. Pascoe, Maynard Garrison, San Francisco, for plaintiff.

Severson, McCallum & Davis, A. McCallum, San Francisco, for plaintiff in intervention.

Bronson, Bronson & McKinnon, E. D. Bronson, Harold R. McKinnon, San Francisco, for defendants American Fidelity & Casualty Co., Inc., and American Plan Corp.

R. F. Tiedeman and P. D. Kakures, Oakland, for codefendant Joseph Lotz.

ROCHE, Chief Judge.

This is an action brought by Mid-States Insurance Company, hereafter called Mid-States, against (1) American Fidelity and Casualty Company, hereafter called American Fidelity, (2) its manager, the American Plan Corporation, and (3) certain agents and officers of these aforementioned defendants.

Plaintiff's complaint charges that the defendants conspired to defraud Mid-States, and that this conspiracy was actually carried out in breach of Lotz' (agent for Mid-States) fiduciary obligations to the Company. The prayer of the complaint is for $297,097.91 and for $50,000 as exemplary and punitive damages.

Counterclaims were interposed by some of the defendants, but little or no evidentiary proof supporting the allegations contained therein was offered at the time of the trial of this case.

The Anglo California National Bank (hereafter called Anglo) has by permission of the court filed a complaint in intervention in this action, and appears as a third party plaintiff. During the period of the conspiracy alleged in the Mid-States' complaint, the defendant Lotz endorsed and deposited in his account certain checks which were delivered to him, but which were drawn to the order of Mid-States. Mid-States in a separate action sued Anglo on the theory that Lotz was not authorized to endorse checks payable to Mid-States, and this suit was settled after trial by payment of $37,500 from Anglo to Mid-States.

Anglo, seeking recovery of this amount from the defendants, alleges that the endorsement of checks by Lotz was an act in furtherance of the fraudulent conspiracy upon which the principal action is based. As an alternative theory, Anglo claims recovery by way of subrogation should Mid-States recover in the principal action. Either theory of recovery depends on the showing of a fraudulent conspiracy on the part of the defendants.

The facts of the case are as follows: Both Mid-States and American Fidelity are insurance companies writing automobile collision insurance. In May, 1947, Mid-States appointed Lotz its general agent for the State of California, and thereafter Lotz procured substantial amounts of insurance business for Mid-States.

In November, 1950, American Fidelity also appointed Lotz as its general agent for this state. As the terms of his agency contract with that company were more favorable to him than those of his contract with Mid-States, Lotz thereafter placed the bulk of his business with American Fidelity. By August, 1951, some nine months later plaintiff's complaint alleges that Lotz was indebted to American Fidelity in the sum of approximately $190,984. As Lotz had sharply curtailed his writings in Mid-States his total indebtedness to that company at that time totaled approximately $30,000.

In the middle of this same month, August, 1951, Lotz and his office manager, Smead went to New York at the request of Mark Hart, president of American Fidelity. Hart had become concerned over the financial condition of the Lotz agency; a concern which was natural since a substantial check given

by Lotz had been returned by the bank unpaid, and there was a large outstanding account which was delinquent. The evidence is conflicting as to exactly what was said and done at this meeting held in Hart's New York offices.

Mid-States contends it was at this meeting that Lotz and Smead disclosed their insolvency, and that the suggestion was made that another insurer be found which would accept Lotz' new policy writings from which premium monies could be obtained to pay off American Fidelity's defaulted account.

There is no dispute, however, that defendant American Fidelity directed that Lotz make prompt collection of his receivables, that immediately after the meeting Lotz proceeded to Chicago and was successful in negotiating a new and more favorable agency contract with Mid-States upon his assurance of giving them an increased volume of business, and that Smead returned to Oakland to make collections from sub-agents.

About a week after the New York meeting, August 20, 1951, Hart and Feller (General Counsel of American Plan) flew to Oakland for further conferences with Lotz and Smead. On August 22, 1951 during this visit defendants executed a written contract which provided (1) that Lotz' agency for Fidelity and Casualty was terminated, (2) that the time allowed for payment of Lotz' total indebtedness was shortened so that payment would be completed by September 15, 1951,[1] and (3) that Lotz' financial control of the business was taken from him, and Smead was to act as representative of American Plan with authority over the financial end of Lotz' agency.

As a result of various transactions between the months of August and November, 1951, Lotz' indebtedness to American Fidelity was completely liquidated and his indebtedness to Mid-States increased substantially.

On November 24, 1951, officers of Mid-States traveled to Oakland and had several conversations with Lotz dealing with his financial condition. Lotz told the officials of Mid-States that he was in the red, and that this condition was due to high operating costs and high commissions paid to sub-agents. On November 27, 1951, Lotz submitted a letter to these officials telling them how he intended to operate his agency from that date on, and setting forth the various plans he intended to put into operation in order to stay in business and pay his indebtedness. The evidence discloses that on November 27, 1951 Lotz also gave Mid-States both a power of attorney and an assignment of his business.

Mid-States alleges that it was not until December 4, 1951 that they learned all of the facts from Lotz concerning the alleged conspiracy to defraud, and that thereafter it sought to reduce its loss. The indebtedness was reduced to the sum of $281,746.96, and it is this sum which plaintiff wishes to recover.

Anglo and Mid-States allege that the fraudulent conspiracy contemplated at least four separate activities, (1) the diverting to American Fidelity of premium funds received by Lotz for the account of Mid-States, (2) the cancelling by Lotz of policies in American Fidelity and the re-writing of these policies in Mid-States at a time when American Fidelity knew that Lotz was insolvent, (3) the writing of vastly increased amounts of insurance in Mid-States by Lotz without regard to the quality of the risks involved, and (4) the concealing from Anglo Bank and Mid-States of Lotz' insolvency and his inability to pay his indebtedness as it fell due.

In order to better understand this case it is essential to indicate the course of dealing between the parties.

The insurance policies of both Mid-States and American Fidelity were being written under what is known gen-

1. Lotz had a 75-day credit period with American Fidelity.

erally as a "retrospective plan." Under this plan, Lotz as general agent appointed sub-agents who were entitled to an immediate commission upon the premiums collected by them. The sub-agents forwarded reporting copies thereof to the company concerned. Lotz then became indebted to the company for the entire amount of the premium although he had a so-called credit period within which to pay it. Lotz was not entitled to receive at any time any commission for himself or for any sub-agent but received his commission after the policy had expired, his commission being dependent upon the losses occurring under the policy. At the expiration of Lotz' credit period he was required to remit the entire premium to the company, which would pay losses from it together with its so-called "retention" and would at the expiration of the policy return any balance to Lotz as his commission.[2]

The original agency agreement between Lotz and Mid-States (May 15, 1947) contained no references to trust. The new agreement entered into September, 1951 provided in part:

"*  *  * All premiums received by the Agent shall be held by such Agent as trustee for the Company.

"*  *  * The keeping of an account with the agent on the company's books, as a creditor and debtor account, is declared a record memorandum of business transacted, and neither such keeping of account, nor alteration in compensation rate nor failure to enforce prompt remittance or compromise or settlement or declaration of balance of account shall be held to waive the understanding that the premiums collected by the agent are trust funds. *  *  *

■  It is a general rule of insurance law that an insurance agent is ordinarily a trustee as to premiums collected, however the way in which Lotz dealt with Mid-States' premiums was habitually inconsistent with a trust.

■  The evidence discloses that Lotz' agency was a retrospective one, i. e., he could not take his commissions out of the premiums he collected, but he had to wait until the premium was earned by the passage of time, and meantime he had to pay his operating expenses, (and later commissions to sub-agents). This required capital, but Lotz himself did not have sufficient working capital to pay all of his operating expenses and sub-agents' commissions. However, he did have a period of credit before Mid-States was to be paid; therefore, he used the company's funds, and Mid-States was fully cognizant of this fact.

Richard Cass, executive of Mid-States when the original Lotz agreement was entered into was asked in his deposition "*  *  * did the company know he

2. As an example of this method of operation:

| | |
|---|---:|
| Assume that a sub-agent collected | $100.00 |
| Assuming 25% commission retained by sub-agent | 25.00 |
| Forwarded to Lotz by sub-agent | $ 75.00 |
| Time within which Lotz had to pay company, assume 65–75 days. End of 65–75 day period full payment to company | $100.00 |
| Retention of company for handling business, assume | 15.00 |
| Balance to pay losses and Lotz' commission | $ 85.00 |
| Net commission to Lotz where no losses | $ 85.00 |
| Less sub-agent's commission | 25.00 |
| | $ 60.00 |

If there were any losses, Lotz' ultimate commission would be proportionately less.

used the money for operating expenses and paying any sub-agents?" and he answered: "There was knowledge of such facts, yes."

The evidence discloses that Lotz, back in 1947, before entering into business with Mid-States told Donnelly the official of Mid-States who engaged him that he had no capital, and in answer Donnelly told him "You have got this length of time to pay our bills * * * you are using the company's money. That is the way the deal is set up."

Now, let us consider Lotz' method of handling funds. He kept two accounts. Into the trustee account went premiums received from sub-agents, salvage, and subrogation and transfers from operating account. He drew on the trustee account to pay premiums, to make transfers to operating account, and to pay sub-agents' commissions where not previously deducted. He drew on operating account to pay his operating expenses and his own personal and living expenses. Commissions which he earned went into the operating account when he received them by check, and when they were received by way of credit against the amount he owed a company the credit was made to his trustee account. He put personal borrowings into the operating account and he made transfers back from operating to trustee account. Such dealings were gravely inconsistent with trust.

In fact, receipt of the premiums is not what gave rise to the obligation from Lotz to Mid-States. The company kept no record of Lotz' receipt of premiums, nor were they concerned with that. Rather, a certain number of days after the close of the month in which business was written, Lotz owed the amount of premiums to the company, regardless of whether he had collected it or not.

As Mr. Hatfield, vice-president of Mid-States testified, Lotz was "an independent contractor" with respect to keeping his own books and his own bank account.

The question posed in determining whether a debtor-creditor relationship now exists is whether the conduct of the parties was so inconsistent with the trust clause in the written contract between them so as to warrant the conclusion that the parties intended to modify the written contract. Garrison v. Edward Brown & Sons, 1944, 25 Cal.2d 473, 154 P.2d 377. Where as in this case, with the company's knowledge, an agent mingled premium moneys with his own funds and otherwise used them inconsistently with a trust, a debtor-creditor relationship is established rather than trustee beneficiary relationship notwithstanding an agreement to the contrary. Garrison v. Edward Brown & Sons, supra; Twin City Fire Ins. Co. v. Green, 8 Cir., 1949, 176 F.2d 532; Horton v. Eagle Indemnity Ins. Co., 86 N.H. 472, 171 A. 322. A debt is not a trust and there is not a fiduciary relation between debtor and creditor as such. Downey v. Humphreys, 1951, 102 Cal.App.2d 323, 227 P.2d 484.

From the foregoing it follows that if the funds were not trust funds they belonged to Lotz and he could use them to pay his obligations provided that no fraud or breach of fiduciary obligation was involved.

The burden in this case is on plaintiff to prove that a conspiracy to defraud Mid-States was entered into between the defendants. Plaintiff in presenting arguments to the court stated that this case is primarily a question of fact case, and was not regarded as involving serious questions of law.

Plaintiff's brief is very exhaustive, and cites many cases which deal with fraudulent acts committed by agents and/or debtors participated in by third parties. All of these cases were helpful in formulating the general principles of law applicable to the questions presented to the court. One case which plaintiff particularly stresses is Machado v. Katcher, 1951, 108 Cal.App.2d 1, 237 P.2d 715.

Of great significance in the Machado case is the fact that there was testimony

that the third party (Lewis) knew that Machado and other creditors could not be paid. Further, a motive for favoring Lewis is indicated by the intimacy between Lewis, Katcher, Sr., and the corporation. For the purpose of distinguishing the instant case, it is the court's view that the defendants were not aware that Lotz' creditors could not be paid. Nor was any motive shown for Lotz to engage in a fraudulent plan, i. e., close relationship to Fidelity and Casualty; dislike of Mid-States. Lotz' sole intention as adduced by the court from the evidence in this case was to pay his debts, and thereby continue in business.

Conflicting evidence was offered concerning the meeting held by the defendants in New York, the alleged birthplace of the fraudulent conspiracy.

Plaintiff charges it was at this meeting that Smead and Lotz first disclosed their insolvency, and that it was there that the suggestion was first made that another insurer be found which would accept Lotz' new business.

The court is of the view that the evidence presented at the trial of this case does not substantiate the allegation that the defendants entered a conspiracy to defraud plaintiff. Fidelity and Casualty asked Lotz for payment, and tried to determine how Lotz intended to pay his indebtedness. Lotz renewed relations with Mid-States and wrote an increased amount of business for this company. Business which Mid-States was anxious to get. The loss ratio on this new business compared favorably with the loss ratio on business Lotz had written for American Fidelity. In fact a great deal of Lotz' prior business with both of these companies had been sub-standard. Hart's testimony rebutted all evidence in the record which attempted to show fraudulent intent on the part of defendants.

It is well to note that Lotz was in the same type of difficulty with Fidelity and Casualty in August, 1951 as he was to find himself with Mid-States in December, 1951. Both companies, as a result of the "retrospective" agency arrangement found Lotz indebted to them in huge sums. In both instances Lotz reacted in the same manner. He directed all his efforts towards saving his agency.

Plaintiff contends that Lotz was hopelessly insolvent in August, 1951, and with that knowledge, as plunging himself into deeper insolvency, preferring American Fidelity, and dooming Mid-States to a large loss.

This knowledge of Lotz' finances can be arrived at only after assembling and studying the figures since the period within which the alleged fraud took place. Actually, no exact knowledge of the financial status of the agency was known when the defendants carried on the various transactions complained about.

From the testimony of the witnesses the court believes that Lotz always had the intention of remaining in business. Nowhere has it been alleged or proven that Lotz reaped any benefits as a result of the alleged fraudulent conspiracy. It is an incompetent conspirator, indeed, who at the completion of his "fraud" ends up in a worse financial condition than when he started. It is hard to imagine a debtor who for absolutely no gain would allow himself to be subjected to approximately three months of constant pressure and haranguing from a creditor anxious for payment. This is not the conduct of a fraudulent conspirator, but rather of a man attempting, and intending to stay in business.

As a witness Lotz gave the impression of being a very confused and mentally upset person. Lotz was formerly a baseball pitcher, and only as recently as 1947 went into the insurance business on a large scale. It was not with his own capital that he accomplished this, but only by using funds which actually belonged to his creditors, and which he had in his possession during the "credit

period." [3] This method of operation was carried on with the knowledge of both Mid-States and Fidelity and Casualty, and is highly significant in determining Lotz' state of mind. The evidence discloses that up until the time that Mid-States took over his agency, Lotz was planning to tighten his management, and reduce operating costs thereby enabling him to meet his bills and eventually put the agency on a more solid footing. This is evident in the fact that as late as November 27, 1951, Lotz developed a plan involving reduction of expenses and other factors designed to render his business more profitable. Moreover, the evidence discloses that Mid-States itself as late as November or early December thought that the situation could be worked out and said that Mid-States would try to help Lotz.

Lotz' testimony threw a great deal of light on his mental processes. Reading Smead's written statements and supplements, Lotz said, "I was very influenced by Ralph's (Smead's) point of view because of my mental condition at that time. I wasn't too much on a good equilibrium basis with this worry and other things, physical condition." It might well be that Lotz was an imprudent, ill-advised business man who did not know very much about the internal operation and problems of his insurance agency, but it cannot be developed from the evidence presented that Lotz had intended to conduct himself fraudulently in trying to save his business.

Plaintiff's brief speaks in generalities of Lotz' duty as an agent of Mid-States to reveal his financial standing and his dealings with other companies. However, the evidence discloses that plaintiff's own conduct was responsible to a great extent for the creation and continuation of those activities which caused plaintiff's losses. Lotz was never held to account as to his financial ability before the time the loss was suffered, and Mid-States did not concern itself with how Lotz kept his books as long as his payments were on time. Lotz was an independent contractor as to the operation of his business. No duty can be spelled out on the part of Lotz to account to Mid-States as long as he and the other defendants did not conspire to defraud Mid-States.

Mid-States had realized in the past that Lotz was not too reliable or experienced a business man. The evidence discloses that in August, 1950, Mr. Titus, president of Mid-States, issued a memo that "Lotz needs to be watched very closely on a day to day basis." In June, 1951, Titus again observed "If we can't get any better representation in California than Joe Lotz, we will never stay out of trouble."

In fact the evidence further discloses that in his dealings with Mid-States Lotz always had been delinquent in his remittances, often from 30 to 60 days, and the record shows letters and telegrams from Mid-States repeatedly demanding payments that were overdue.

Plaintiff relies to a great extent on statements prepared and signed by Lotz and his office manager Smead. The evidence discloses that before the trial of this case Smead testified under oath on numerous proceedings arising out of the subject matter of this case. Various material inconsistencies were evident in his testimony, and during trial of this case the court interrogated the witness as follows:

The Court: "If I understand you, then, you admit yourself you lied?"

The Witness: "Yes sir * * *."

In view of this admission of untruthfulness, and the poor impression Smead made as a witness it is possible for the court to give very little credence to his testimony.

Ralph Smead was appointed on August 22, 1951 to act as agent of Fidelity and Casualty in supervising the payment of

3. Both companies, competing with each other for a volume of business in this State, offered attractive inducements to Lotz in order to secure his account, i. e., longer credit periods, less retention.

Lotz' indebtedness to that Company. Fidelity and Casualty wished to have someone in Lotz' agency who could be relied upon. Lotz himself was a sick and disturbed man, and the evidence discloses that he relied very heavily on Smead's abilities. In the absence of a showing of fraudulent intent on the part of the defendants, the act of appointing Smead does not appear overly significant to the decision in this case.

Plaintiff Mid-States cites Lotz' rewrite of a large block of insurance, termed the public service transaction, as an example of the devices used by defendants to effectuate their conspiracy to defraud Mid-States. The evidence discloses that Mid-States was aware of the transaction except for a few days delay in reporting which was due to secretarial work in typing a large number of reports, and that Mid-States and Lotz carried on correspondence discussing this transaction, Lotz being able to clear up the objections which Mr. Hatfield had to some of the risks involved.

Complaint is also made of a transaction involving another insurance rewrite, a block of insurance policies from American Fidelity to Mid-States, the amount involved being about $61,000. It is alleged by plaintiff that it was induced to enter this transaction by certain alleged misrepresentations made by Hart, President of American Fidelity, to Hatfield, Vice-President of Mid-States.

The evidence discloses that this conversation took place on October 31, 1951. In order to understand the import of Hart's words one must take into consideration that Mid-States was anxious to get all of Lotz' business, and that on September 8, 1951, Lotz had told Mid-States that his agency was no longer sending American Fidelity any business whatsoever.

Taking into consideration the fact that Hart and Hatfield were both experienced business executives in large competing insurance companies it is the court's view that Hatfield did not rely on Hart's representations. Additionally, the court carefully read the conversation between Hart and Hatfield, and gives little weight to the argument that Hart's words were fraudulently intended. The conversation had must be read with the entire record of the case in mind in order to give the words contained therein their proper perspective and significance.

From a study of the entire record in this case the court concludes that plaintiff has not sustained the burden of proving a conspiracy to defraud between the defendants. The underlying factor which motivated both insurance companies in this case was to secure all the business possible in this State, and it was this anxiety for business which caused a great loss to one of them.

The fundamental basis of plaintiff's case is the written statement of Smead, and Smead's word is impugned by his own admission of untruthfulness. The course of dealing between the parties discloses a method of handling the Lotz agency which was contrary to a trust relationship, and in the absence of a showing of a fraudulent conspiracy on the part of the defendants, plaintiff cannot prevail. Lotz in paying Fidelity and Casualty preferred the creditor who was vigilant and actively pursued collection of its debt.

Anglo Bank, in accord with the above reasoning, has no right of recovery against the defendants as it was stated in the bank's brief that should Mid-States fail to prove a fraudulent conspiracy it too, would be precluded from recovery.

In accordance with the foregoing

It is ordered that judgment be entered herein upon findings of fact and conclusions of law as follows: That plaintiff Mid-States Insurance Company take nothing by its complaint against the defendants, that Anglo Bank, plaintiff in intervention take nothing by way of its complaint against the defendants, and that defendants Peter Lotz, American Fidelity and American Plan take nothing by way of their counterclaims. The respective parties to pay their own costs.