MID-STATES INSURANCE COMPANY, a corporation, and The Anglo California National Bank of San Francisco, Appellants,

v.

AMERICAN FIDELITY AND CASUALTY COMPANY, Inc., a corporation, American Plan Corporation, a corporation, Mark Hart, Joseph Lotz, Ralph L. Smead and L. Sudekum, Appellees.

No. 14695.

United States Court of Appeals Ninth Circuit.

June 12, 1956.

Wallace, Garrison, Norton & Ray, Maynard Garrison, San Francisco, Cal., Lewis Schimberg, Chicago, Ill., for appellant, Mid-States.

Severson, McCallum & Davis, Almon B. McCallum, Nathan R. Berke, San Francisco, Cal., for appellant, Anglo Bank.

Bronson, Bronson & McKinnon, E. D. Bronson, Harold R. McKinnon, San Francisco, Cal., for appellees.

Before HEALY, POPE and FEE, Circuit Judges.

POPE, Circuit Judge.

This is an appeal from a judgment which denied relief to Mid-States Insurance Company, plaintiff in the court below, and also denied relief to Anglo-California National Bank of San Francisco, which intervened in the action and filed its complaint against the same defendants, appellees herein.[1]

---

1. In another action pending at the same time in the same court, Mid-States had sued the Anglo California National Bank, hereafter called Bank, and the Bank as third party claimant, filed a third party complaint in that action against the same persons who are defendants here, setting up the same claims against them as those contained in its complaint in intervention above mentioned. The issues arising upon these identical claims in the two actions were tried together and a single judgment entered. In this opinion the proceedings below will be dealt with as though they occurred in but a single action.

The facts in the case appear in the trial court's opinion which is reported in 125 F.Supp. 34, where they are outlined at greater length than will be necessary for the purposes of this opinion. As the findings disclosed, both Mid-States and the defendant American Fidelity and Casualty Company were corporations engaged in the business of writing and selling automobile insurance policies in the State of California. Mid-States is an Illinois corporation and American Fidelity is chartered in Pennsylvania. The defendant, American Plan Corporation, is a New York corporation; it was the manager of the automobile physical damage insurance business of American Fidelity.

In May, 1947, Mid-States appointed the defendant Joseph Lotz its general agent for California, and he remained an agent in that company until January 21, 1952. In November, 1950, American Fidelity also appointed Lotz as its general agent for California, and he continued in that capacity until August 22, 1951. Both of these agencies provided for an arrangement whereby the agent received his commission under what is called the "retrospective" plan. This meant that the agent was required to pay to the insurance company the full amount of the premium collected on the insurance written without deducting his commission. Although the agent had an agreed period of time after the close of each month in which to pay the month's premiums to the insurance company, yet at the end of that so-called "credit period" he had to pay the full amount of the premium to the company. At a later time, after the loss experience of the company upon the insurance written had been determined, the agent's commission would be paid to him, or he would be credited with it, the commission being dependent upon the company's loss experience.

By August 1, 1951, Lotz was indebted to Mid-States for approximately $30,000, and to American Fidelity for approximately $190,000. By August 22, 1951, this indebtedness to American Fidelity had climbed to approximately $247,500. Within the next few months and before January 1, 1952, Lotz' indebtedness to American Fidelity was completely liquidated, but within the same period his indebtedness to Mid-States increased to a sum in excess of $287,000. The issues raised by Mid-States relate to transactions by Lotz and American Fidelity during this period of a few months whereby American Fidelity succeeded in collecting in full the large amount previously owing to it, and Mid-States was left with a similarly large uncollectible claim against Lotz who was insolvent. It is alleged that in the main this was accomplished through various acts of Lotz performed with the knowledge and collaboration of American Fidelity whereby he improperly transferred to Fidelity the premiums collected by him on policies written for Mid-States, which premiums he held in trust for that company. It is also alleged that some $61,000 of this former indebtedness to American Fidelity was liquidated by procuring Mid-States to rewrite with its own policies a block of insurance previously written by American Fidelity on which the premium value was $61,000, and that this rewriting on the part of Mid-States was procured by the fraudulent representations and misstatements made to it by the officers of American Fidelity. Thus, it will be noted, Mid-States' complaint against American Fidelity is based in part upon its claim that it may follow trust funds wrongfully diverted by Lotz into the hands of American Fidelity which is charged not only with knowledge of their improper diversion but with actively procuring the diversion; and in part upon its claim of loss arising out of the alleged fraud and misrepresentation relating to the $61,000 mentioned.

What transpired within this comparatively short period of time during which American Fidelity collected the large indebtedness from what Mid-States claims was its funds, is rather fully outlined in the trial court's opinion and in its findings. By the middle of August, 1951,

Hart, President of American Fidelity, had become much concerned over the large amount owing by Lotz, much of it past due and delinquent. A large check from Lotz had been dishonored by the bank. Hart had Lotz and his office manager, Smead, go to New York to discuss these delinquencies. Lotz was strongly urged by Hart to take some steps at once in order to provide funds to pay off American Fidelity. Immediately after this meeting in New York, Lotz went to Chicago and negotiated a new and more favorable agency contract with Mid-States, giving that company assurance of increased business. At the same time Smead returned to California to speed up collections from Lotz' sub-agents. About a week after the New York meeting Hart flew to Lotz' office in Oakland for further conferences with Lotz and Smead and on August 22, 1951, defendants American Fidelity and American Plan executed the written contract with Lotz which is described in the trial court's opinion.

This writing terminated Lotz' agency for American Fidelity; it called for payment and liquidation of his total indebtedness to American Fidelity by September 15, 1951, and it made Smead the agent of American Plan with authority over the American Fidelity end of Lotz' agency. At the same time Hart gave Smead a letter of instructions which read as follows: "Under even date memorandum of agreement has been executed by Joseph Lotz which in part stipulates that you will serve as the representative of American Plan Corporation with respect to the ultimate liquidation of all monies referred to in Paragraphs 1 and 2 ($247,000.00 owing by Lotz to American Fidelity) in said agreement.

"As the representative of this corporation you have full authority to deposit to the account of The American Fidelity and Casualty Company at the Central Bank in Oakland all monies received by Lotz. * * * You are to have full and supreme authority regarding financial affairs of Joseph Lotz, subject to instructions that may be transmitted to you

from time to time by The American Plan Corporation, and in the event that you are prevented from performing your responsibility in any respect it will be your duty to notify immediately The American Plan Corporation.

"In consideration of the proper performance of your duties as representative and in the event the items referred to in Paragraphs 1 and 2 of said agreement are completely liquidated by September 15, 1951, you are to receive a fee from us in the sum of $1,000.00."

Following this arrangement Lotz wrote no more business for American Fidelity but proceeded to procure a large volume of insurance for Mid-States, to issue the latter's policies, and to collect the premiums thereon.

The record shows that in large part these premiums collected on account of Mid-States' business became the funds which were used to pay off Lotz' indebtedness to American Fidelity. Thus at the time Hart was at Oakland making the arrangement previously described, Hart, Lotz and Smead discussed a contemplated plan whereby Lotz would take over and rewrite a large volume of automobile insurance previously written by a concern known as Public Service Insurance Company. This arrangement was carried out as planned and this block of insurance policies was rewritten by Lotz in Mid-States. This involved the cancellation by Public Service of policies representing gross premiums of $150,000. The policies were rewritten in Mid-States for their unexpired terms. The portion of the premiums representing these unexpired terms were paid by checks of Public Service and made payable to Mid-States. These premiums, thus owing to Mid-States, aggregating some $96,000, were deposited by Lotz in his own trustee account, and approximately $90,000 thereof were paid to American Fidelity. Hart knew that the checks had been made payable directly to Mid-States, and he knew that the $90,000 came from this source.

Because of the view which the trial court took of this and other transactions

by which Lotz, following termination of his agency for American Fidelity continued to write policies in the name of Mid-States, collecting the premiums and diverting those to the liquidation of his indebtedness to American Fidelity, the trial court made no findings as to either the specific or the aggregate amounts of the transactions thus handled. But it is plain from the record that these totaled large sums.

When Lotz' agency for American Fidelity terminated on August 22, 1951, there was a substantial amount of uncollected premiums arising out of business previously written for American Fidelity. It is not entirely clear whether that amount was $75,000 or $140,000, but in any event it was far less than the $247,000 which Lotz owed to American Fidelity, and since the latter sum was liquidated, it appears from the record that the liquidation in large part came from sources similar to these Public Service premiums, that is to say, from premiums collected for Mid-States.

The court made some general findings to the effect that the defendants did not induce or cause Lotz to pay them funds received by him as premiums on insurance written or procured by him for Mid-States; that defendants did not know that these were trust funds held by Lotz as a fiduciary or that such funds were to be applied to the payment of the indebtedness of American Fidelity.

■ We think this to be clearly erroneous. Hart himself testified that he knew about the arrangement for rewriting the Public Service policies in the Mid-States company. It will be recalled that Smead, who, under the August 22, 1951 arrangement, was the agent for American Fidelity, and as such agent had "full and supreme authority regarding financial affairs of Joseph Lotz",

knew what was going on and American Fidelity must be charged with his knowledge. Not only that, but Smead kept Hart himself informed.[2] Hart was asked the question: "Did you understand that the Mid-States business was the only source of revenue that the man had?", to which he replied: "No." While that answer may be technically accurate in that there were the old uncollected accounts on the American Fidelity business, yet by and large Hart must have known that if he was to collect the money for his company with the aid of his agent Smead from Lotz, the bulk of the funds would have to come from Mid-States premiums. When Lotz had been called to New York, Hart knew that he was in financial difficulties; that his checks had "bounced"; and furthermore, American Fidelity had knowledge through Smead, if not otherwise, that generally speaking the only place where Lotz could get his hands on funds to pay to American Fidelity was by taking them out of premiums collected for Mid-States.

Notwithstanding all this, the trial court found and concluded that Lotz did not collect or hold any trust funds for Mid-States and that no trust funds were diverted from Mid-States to or for the benefit of American Fidelity or American Plan. The court arrived at this conclusion through its analysis of the course of dealing between Mid-States and Lotz during the period of his agency up to August, 1951. It further found that Mid-States knew that Lotz had no capital of his own; that he had to pay his agency expenses currently; that he had to wait for discovery of the losses under the retrospective plan, and hence it was understood that he could use premiums collected for his own expenses; that these expenses during the latter portion

---

**2.** Smead was in almost daily telegraphic communication with Hart. The content of these messages, which were received in evidence, indicates that Hart knew not only the general course of procedure being followed in respect to the collection of these checks for premiums due Mid-States, but he knew about the individual checks and their amounts for he wired Smead on various occasions asking specific advice as to whether the proceeds collected on certain checks, describing them, had been deposited to the American Fidelity account.

of this period became large as his business accrued; and that he also had to pay commissions of subagents and that the money had to come from this same source.

The court further found that Lotz kept two bank accounts, one called "Trustee Account" and the other "Operating Account". He deposited premiums received in the trustee account, and drew on that account to pay premiums to companies he represented. He also transferred moneys from this account to his operating account to pay operating expenses and personal drawings. Apparently the premiums received from various companies were commingled in the trustee account. He was habitually overdue in his payments to Mid-States which regularly dunned him for them. Accordingly the court found that Mid-States considered Lotz as an "independent contractor" with regard to the keeping of his books and bank account, "and in full charge of those matters". It was because of this finding that the court concluded that the premiums collected by Lotz on the Mid-States business were not trust funds and that the passage of these funds to American Fidelity was not the diversion of funds held by him in a fiduciary capacity.

However, the record and the findings themselves disclose that near the end of August, 1951, a completely new arrangement was made between Mid-States and Lotz. This was at the time previously mentioned, when following his trip to New York Lotz went to Chicago and called upon Mid-States. He then negotiated a new agency contract with Mid-States, the provisions of which were incorporated in a writing dated September 1, 1951. The negotiation of this new arrangement with Mid-States was substantially simultaneous with the termination of the insurance agency which Lotz had previously held for American Fidelity. Under this new arrangement, differing from the old one, Lotz was permitted to retain out of premiums collected an advance commission of 15 per cent. The old agreement had contained no reference whatever to trust, but the new one provided that all premiums received by the agent should be held by him as trustee for the company. The written provisions which implemented this new arrangement were extensive and elaborate. Some are quoted on page 37 of the trial court's opinion; others provided that the privilege of taking the advance commission was not to be construed as changing the relationship of the parties or as modifying the fact that the premiums received were trust funds.[3]

We think it unimportant for the purposes of this decision to consider whether the court's determination that the former course of dealing between Mid-States and Lotz made him an independent contractor rather than a trustee or fiduciary was in the nature of a finding of fact or conclusion of law. If it were a conclusion of law, it might be an interesting question whether it was erroneous and contrary to law in view of the provisions of § 1730 of California Insurance Code.[4] But assuming that this finding

3. While the trial court appears to have attached considerable importance to the fact that under the prior arrangement Lotz was permitted to use portions of premiums collected to pay his agency expenses, it seems clear that such an arrangement is not inconsistent with the premiums being held in trust. It would appear to be one thing to use such funds for the agency itself, even though the agent is required ultimately to pay them, and quite a different thing to use them to pay the agent's personal debts to others. However, the pains which were taken in this clause to guard against any misunderstanding on this point, illustrates the care with which the new agreement appears to have been drawn.

4. § 1730 Cal.Ins.C.A., 1937, "Premiums received by agent, etc., in fiduciary capacity: Misappropriation. All funds refunds received by any insurance agent, broker or solicitor, life agent, surplus line broker, or motor club agent as premium or return premium on or under any policy are received by such agent, broker or solicitor in his fiduciary capacity. Any agent, broker or solicitor who diverts or appropriates such funds to his own use is guilty of theft and punishable for theft as provided by law." (As the statute read prior to 1951 amendment.)

or conclusion of the court was an accurate description or determination of the actual arrangement or understanding between Mid-States and Lotz up to August, 1951, there is no reason why Mid-States was not at liberty to enter into the new arrangement described when it negotiated the new contract; nor do we know of more apt language which might have been adopted to describe and create the trust relationship. And, of course, American Fidelity was fully aware of this new arrangement for its agent Smead was on hand and in Lotz' office.

█ It follows that with respect to this portion of Mid-States' claim against American Fidelity and American Plan, the funds thus diverted from moneys received as premiums on insurance written by Mid-States and paid over to American Fidelity were in fact and in law trust funds. And for these, to the extent they may be traced into the hands of American Fidelity, the defendants must be required to account.[5]

Reference is made in the trial court's opinion and in the findings to the fact that Lotz was a rather incompetent fellow with no previous training other than as a professional baseball player, and that his books of account were in a chaotic state and inadequate to show the true financial condition of his agency. It is noted that during this period of time Mid-States was eager to obtain the large volume of business which Lotz was writing for it and out of which he was deriving the premiums which he was diverting to American Fidelity. Reference is also made to the fact that some of the insurance thus written by Lotz was substandard and resulted in increased loss ratios with lessening of Lotz' commission, all to the knowledge of Mid-States.

█ All of these matters may have a tendency to show that Mid-States was guilty of some degree of negligence or inattention, but we know of no rule which would prohibit the owner of trust funds or the beneficiary entitled thereto from following those trust funds into the hands of a person who has wrongfully acquired them merely because of the beneficiary's negligence. Mid-States did exercise care in drafting an agency contract which stated as elaborately as could possibly be done, the agreement that these premiums were to be trust funds. No more was required of it.

The findings also contain numerous statements to the effect that during the time in question defendants did not know that Lotz was insolvent or that he would be unable to pay Mid-States the amount of premiums on the business written, and that the defendants did not plan any action designed to conceal Lotz' insolvency or inability to pay from Mid-States or from the Anglo Bank. These findings also are without significance we think for even if the defendants had thought that Lotz might be able to make up from some other source the loss to Mid-States of the trust funds diverted to the defendants, that would have made no difference in the obligation of the defendants to account. But defendants could have had no such belief. It appears from the testimony of Hart, that about August 29, 1951, he wrote to one of his subordinates: "You are instructed to inform any one who inquires that Joe Lotz is up to date in his accounts with us and is not delinquent. This is not only extremely important, but it is actually true as Joe Lotz' May balance is technically paid and his June balance is not due until September 15, 1951." This, it will be recalled, was written sometime after

5. Cal.Civ.Code § 2322. "Exceptions to general authority. An authority expressed in general terms, however broad, does not authorize an agent: * * * 3. To do any act which a trustee is forbidden to do by Article 2, Chapter 1, of the last Title."

Cal.Civ.Code § 2229. "Trustee not to use property for his own profit. A trustee may not use or deal with the trust property for his own profit, or for any other purpose unconnected with the trust, in any manner."

Cal.Civ.Code § 2243. "Third persons, when involuntary trustees. Every one to whom property is transferred in violation of a trust, holds the same as an involuntary trustee under such trust, unless he purchased it in good faith, and for a valuable consideration."

Lotz had been called to New York to talk over his very large delinquencies. The means by which Hart was able to rationalize the assurance which he apparently felt he had to give to his subordinate that "this was actually true" and that the balance was "technically paid", was that he went through the form of making a loan of $38,000 to Lotz, which was the amount of the May balance, and the amount of this loan was entered upon the American Fidelity's books which created the appearance on the books of having made the May balance current.

However useful these bookkeeping entries may have been in warranting Hart's subordinates to give comforting assurances to other inquiring creditors, it does not warrant this court in overlooking Hart's testimony that when he went to Oakland at the time he terminated the Lotz' agency, his concern about collecting the balances owing from Lotz "was very great". Apparently his concern had not lessened from the time Lotz had been called to New York; and during the month of September, 1951, at the very time when Public Service rewrite premiums were being funneled into the hands of the defendants, Hart was repeatedly wiring Lotz urgent demands for remittances including such statements as "tomorrow is deadline", "we are considerably disturbed over your failure to live up to your agreement to liquidate our balances"; telling about concern over the attitude of the company if the auditors uncovered the delinquency; referring to "drastic steps immediately", and taking "necessary action including advices to the insurance department and other local authorities."

Another portion of Mid-States' claim against the defendants relates to a final indebtedness of approximately $61,000 which remained owing from Lotz to American Fidelity on November 1, 1951. American Fidelity and the other defendants succeeded in procuring a liquidation of this balance through an arrangement which was negotiated by Hart with Mid-States. The proposal made and carried out was that a volume of insurance carried by American Fidelity and which represented an unusual premium value of $61,000 would be transferred to Mid-States. This was insurance which had been formerly written by Lotz for American Fidelity and on account of which he had collected the premiums. The effect of the proposed rewrite in Mid-States and the transfer of the liability on the insurance to Mid-States would be that Lotz became indebted to Mid-States for the unearned premiums; he was relieved of his obligation in that amount to American Fidelity and the unpaid balance to American Fidelity would be satisfied. And since Lotz was insolvent, this meant that American Fidelity was ahead $61,000, and Mid-States would be out that amount. In order to accomplish this rewrite, Hart telephoned to Hatfield, President of Mid-States, for the purpose of inducing the latter to take on this insurance. This telephone conversation was recorded and transcribed. It was introduced in evidence and what Hart said on that occasion is precisely demonstrable from the recording. It is undisputed.

In the course of this conversation Hatfield said, referring to Lotz and Smead and the Lotz agency, "You did not kick them out, I know that". Hart replied: " * * * No, we did not kick them out. Of course not." Hart knew but did not tell Hatfield that Lotz' contract with the American Fidelity had been cancelled, or that Smead had been appointed American Fidelity's representative; that Lotz had been given until September 15, 1951, to clean up his indebtedness, and that the handling of his money had been turned over to Smead. When Hart told Hatfield that Lotz had not paid American Fidelity the premiums on these policies involved in the proposed re-write, Hatfield asked Hart how old the business was, and Hart replied "September", Hatfield repeated "September", and Hart said "September, and there is some August; but you see the September business is not due under our contract—we have 75 days * * * actually until

December 15." Hart knew of course that Lotz' agency had been cancelled in August and all policy forms in the office had been destroyed when Hart was there in August. There could not have been any business written in September. Not only were these deliberately false statements, but they were made in a context which involved concealment of Hart's knowledge of a financial condition on the part of Lotz which, according to his own statement, had caused him great concern.

In our view the representations and concealment here involved were false and fraudulent. The inference that they were made for the purpose of deceiving and defrauding Mid-States is irresistible, and we hold that the trial court's findings to the contrary are clearly erroneous.[6] In Hayter v. Fulmore, 92 Cal. App.2d 392, 398, 206 P.2d 1101, 1105, it was said: "A fraudulent intent to deceive another may be inferred from a material statement which is made with full knowledge that it is false. When one deliberately makes false representations of material facts, knowing them to be untrue, the law supplies the fraudulent intent to deceive." And with respect to the finding that Mid-States did not rely on Hart's false statement, attention is called to the rule stated in Restatement of the Law of Contracts, § 479, as follows: "Where fraud or misrepresentation is material with reference to a transaction subsequently entered into by a person deceived thereby, it is assumed in the absence of facts showing the contrary that it was induced by the fraud or misrepresentation." [7]

There are no facts showing the contrary here, or that Mid-States' action was not induced by these false statements. With respect to the remark about not having "kicked out" Lotz, Hart attempted to explain that this was not a false statement because Lotz' agency was terminated by mutual agreement. This explanation of Hart is at best only as assertion that his statement was partly true; but one who undertakes to make statements under circumstances such as this, is bound not only to state truly what he tells, but also not to suppress or conceal any facts within his knowledge which materially qualify those statements. " 'If he speaks at all, he must make a full and fair disclosure.' " Pohl v. Mills, 218 Cal. 641, 24 P.2d 476, 481. We hold Mid-States entitled to recover from American Fidelity such amount as it lost in consequence of this transfer to it of the insurance thus rewritten.

The Appeal of Anglo California.

This brings us to the appeal of Anglo California from the judgment which, in addition to denying Mid-States relief, denied relief to the Bank as plaintiff in intervention. As noted in footnote 1, supra, the same claim was presented by it in a third party complaint in the action therein named.[8] This claim stemmed

---

6. "There is of course no difficulty in finding the required intent to mislead where it appears that the speaker believes his statement to be false." Prosser on Torts, 2nd Ed., p. 538.

7. "[W]here it is intended to mislead, the recipient is not required to investigate, and his reliance is regarded as unjustified only if the truth should be apparent to his observation, or discoverable without effort. * * * The last half-century has seen a marked change in the attitude of the courts toward the question of justifiable reliance. Earlier decisions, under the influence of the prevalent doctrine of 'caveat emptor,' laid great stress upon the plaintiff's 'duty' to protect himself and distrust his antagonist, and held that he was not entitled to rely even upon positive assertions of fact made by one with whom he was dealing at arm's length. It was assumed that any one may be expected to overreach another in a bargain if he can, and that only a fool will expect common honesty. Therefore the plaintiff must make a reasonable investigation, and form his own judgment. The recognition of a new standard of business ethics, demanding that statements of fact be at least honestly and carefully made, and in many cases that they be warranted to be true, has led to an almost complete shift in this point of view." Prosser on Torts, 2nd Ed., pp. 550, 552, 553.

8. This was No. 31311 in the court below.

from the following facts: About August 31, 1951, Lotz opened a commercial account with the Bank at Oakland, in the name of "Joe Lotz, Trustee". He deposited in this account various checks made payable to the order of Mid-States. These were among the checks previously described which were received by Lotz on account of insurance written for Mid-States under his new contract dated September 1, 1951, and included the Public Service Insurance Company checks previously mentioned. A few days previous to the time when the account was opened with Anglo-California, the first check from Public Service had been received by Lotz and it was made payable to him personally. Public Service stopped payment on that and reissued the check payable to Mid-States. Lotz wrote to Mid-States on August 27, 1951 stating that "This Bank I am doing business with wants a resolution from your Board of Directors verifying that I have authority to endorse premium checks payable to Mid-States Insurance Company for deposit in my trustee account". He was then doing business with Central Bank. His letter requested the authority by return airmail. The authorization was not sent him but on September 5, 1951, Mid-States wrote a long letter explaining why it hesitated to grant such an authority. This letter was supplemented by a further letter of September 10, 1951, giving additional reasons for not granting authority to endorse checks. In the interim Lotz renewed his request, but the authority was not granted. Whether his failure to furnish the resolution to Central Bank which had demanded it was or was not the occasion for it, the fact is that the Anglo-California account was opened in this different bank on August 31, and Lotz and Smead both testified that on that occasion they told the Bank that Lotz had authority to endorse checks made payable to Mid-States. Smead also testified that he knew that Mid-States had refused Lotz authority to endorse checks made payable to the Company. It will also be recalled that at the time in question Smead was

agent for American Fidelity. The Bank received the checks thus payable to Mid-States and endorsed by Lotz and collected and placed the proceeds in the "Joe Lotz, Trustee" account in reliance, it says, upon these Lotz and Smead representations. It thus appears that in the process of collecting premiums on the Mid-States business, some of the amounts thus collected by Lotz were transmitted to him by check made payable to Mid-States. For the reasons we have previously indicated, all funds thus collected by him were trust funds which he received as a fiduciary regardless of whether the checks were made payable to him or to Mid-States. But as to the Bank, because it received and collected funds from checks made payable to Mid-States upon the strength of unauthorized endorsements of Mid-States' name, the latter had special recourse against the Bank and so brought the action against it which is mentioned in footnote 1, supra.

Approximately one year prior to the entry of judgment here appealed from, judgment in the other action, (No. 31311) was entered for Mid-States against the Bank in the sum of $37,500. This judgment was entered after that portion of that case had been submitted separately to the trial judge. It was entered by consent of the Bank and was satisfied by the Bank. Thus it is to be noted that although the person unjustly enriched, and this to the full extent of the trust fund diversion, is American Fidelity, yet Mid-States has received partial satisfaction for its loss to the extent of this $37,500 through the payment of the judgment against the Bank.

This would appear to present an appropriate case for the application of the doctrine of subrogation. As stated in Restatement of the Law of Restitution, § 162: "Where property of one person is used in discharging an obligation owed by another or a lien upon the property of another, under such circumstances that the other would be unjustly enriched by the retention of the benefit thus conferred, the former is entitled

to be subrogated to the position of the obligee or lien-holder."

"The doctrine of subrogation, extended far beyond the limitations of the early civil law, has been held available to those who, not acting voluntarily, pay the debt of another which in equity and good conscience should have been discharged by him * * *." Fresno Inv. Co. v. Brandon, 79 Cal.App. 387, 249 P. 548, 549.

"The right of subrogation can arise only in favor of one who has, under some duty or compulsion, paid the debt of another. It arises where one having a liability in the premises pays the debt due by another under such circumstances that he is in equity entitled to the security or obligation held by the creditor whom he has paid." Arp v. Blake, 63 Cal.App. 362, 367, 218 P. 773, 775.

 Of course, ordinarily the person claiming subrogation must make full payment of the debt to which he seeks subrogation. See Finnell v. Jas. H. Goodman & Co. Bank, 156 Cal. 18, 103 P. 483. We think, however, that the fact that the $37,500 is substantially less than the total amount of Mid-States original claim for diversion of trust funds, is no obstacle to the application of the equitable principles of subrogation in support of the Bank's claims in this particular case. The general rule that such payment of a part of the creditor's claim will not give rise to a right of subrogation, is a rule for the protection and benefit of the creditor only. He is entitled to remain in entire control of the debt and of procedures for its collection as long as any of it remains owing to him. But if the creditor acquiesces in or consents to the assertion of a subrogation pro tanto by one who has paid a portion of the debt, no one else is entitled to object thereto. Standard Surety & Casualty Co. of New York v. Standard Accident Ins. Co., 8 Cir., 104

F.2d 492, 497.[9] In this case Mid-States has interposed no objection to the Bank's claim against the defendants but has acquiesced in its prosecution.[10]

Wholly apart from Mid-States acquiescence, it seems plain that in the course of the proceedings which we here review, the balance of the claim against the defendants, apart from the portion represented by the $37,500, will be collected from the defendants and discharged. As of that time Mid-States' interests will have terminated and with it any possible objection to the Bank's subrogation to the extent of its $37,500. In Comment (c) under the section of Subrogation (§ 162, supra), in the Restatement on Restitution, after statement of the ordinary rule respecting the lack of right to subrogation of one who has only partially discharged an obligation, an exception to that rule is stated as follows: "If the balance of the claim is subsequently discharged by the obligor, however, the person whose property was used in discharging a part of the obligation is entitled then to be subrogated to the claim to the extent that his property was used in discharging the claim." To the same effect see Piedmont Coal Co. v. Hustead, 3 Cir., 294 F. 247, 252, 32 A.L.R. 556. It is not a valid objection that at the moment of this decision the balance of the claim herein involved has not been discharged, for the reason that Rules 14 and 18(b) Fed.Rules Civ.Proc., 28 U.S.C.A. expressly authorize an acceleration in the determination and adjudication of a claim such as that of the Bank.

Rule 14 permits the third party complaint to be filed against a person "who is *or may be* liable to him for all or part of the plaintiff's claim against him." (Emphasis added.) This is a purely procedural rule and as pointed out by Judge Joyce in Concordia College Corp. v. Great American Ins. Co., D.C., 14 F.R.D.

9. Cases are collected in an annotation at 9 A.L.R. 1596 at page 1608, and in 83 C.J.S., Subrogation, § 10, p. 609.

10. Says Mid-States: "Mid-States has no interest in Anglo's claim against the defendants for the recovery of the amount paid by Anglo to Mid-States in settlement of the latter's suit against it, or in Anglo's appeal in this case."

403, 405 (a case involving a conditional right of subrogation), "the mere acceleration in time does not make the presentation of such claim premature." As there stated, "it must be recognized that Rule 14 is intended primarily to avoid circuity of action and in aid of that purpose should be liberally construed." The purposes of Rules 14 and 18(b)[11] can readily be implemented either by the entry of a conditional judgment as in United Gas Corp. v. Guillory, 5 Cir., 206 F.2d 49, or by making provision for a separate trial of the remaining undetermined issues relating to the claim for subrogation, as authorized by Rules 20(b) and 42(b).[12]

The appellees contend that this claim on the part of the Bank cannot be asserted because the judgment against it for $37,500 was consented to by it. We think that this constitutes no basis for a defense on the part of these defendants for it sufficiently appears that the payment by the Bank to Mid-States was not volunteered on its part. This position of the defendants comes with poor grace on their part for it is manifest that had not the $37,500 been paid to Mid-States by the Bank, Mid-States would have recovered just that much more in its own name against the defendants.

We hold therefore that Anglo-California has made a case for recovery by way of subrogation against the defendants. For that reason we find it unnecessary to consider the other ground upon which the Bank sought recovery here, namely, that liability was predicated upon the false representations of Smead, agent for defendants, to the effect that Lotz was authorized to endorse checks payable to Mid-States.[13]

It would appear that even under the trial court's findings a judgment should have been entered against the defendant Lotz for the amount of his unpaid indebtedness to plaintiff Mid-States. Such judgment is now ordered. Smead who participated with American Fidelity and American Plan in the diversion of the trust funds referred to, must be held liable equally with American Fidelity. Anderson v. Thacher, 76 Cal.App.2d 50, 172 P.2d 533; Smith v. Ayer, 101 U.S. 320, 327, 25 L.Ed. 955. Although Hart and Sudekum were named as defendants, they were not served and did not appear.

The cause is remanded to the district court with directions to take an accounting for the purpose of ascertaining and determining the amounts owing, pursuant to and in accordance with the judgment of this court as stated in this opinion, to each appellant. This will require a determination by the court of the actual amount of the loss suffered by Mid-States in consequence of its re-writing of the American Fidelity insurance. The court must determine the extent and the amount of the trust funds diverted to the defendants American Fidelity and American Plan. The final judgment shall reflect the right of Anglo California to be subrogated to that portion of the total amount of the trust funds diverted which is represented by its payment to Mid-States pursuant to the judgment against it.

The judgment is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

---

11. See the discussion in 3 Moore's Federal Practice, 2nd Ed., § 14.08.

12. See the discussion in Moore's Federal Practice, 2nd Ed., Vol. 3, p. 1829, concerning the utilization of Rules 20(b) and 42(b) in connection with Rule 18(b).

13. As indicated above, Smead testified that he had told the Anglo Bank that Lotz had authority to endorse these checks. He also testified that he had never told the Bank about the letters from Mid-States explaining why the latter would not grant such authority. This appears to be the only testimony on this point as it seems that no representative of the Bank was called as a witness. The trial court's opinion discloses that the Judge placed little credence in Smead's testimony. There is no specific finding as to whether Smead made these representations to the Bank respecting Lotz' authority. In view of our disposition of the matter, the lack of such a finding is not significant here.