## SMITH v. AYER.

## SMITH v. NATIONAL BANK.

1. A principal is, in law, affected with notice of all facts, of which notice can be charged upon his attorney.
2. Parties who deal with an executor, exercising his power of disposition of the personal assets of the estate in his hands, to raise money, not for the estate or the settlement of its affairs, but for the business of a commercial firm, are bound to look into his authority, and are held to a knowledge of all the limitations which the will, as well as the law, puts thereon.
3. His sale or pledge of assets made for other purposes than the discharge of his duties as executor, will not be sustained where the purchaser or pledgee takes them with knowledge or notice of the perversion of them, or the intended perversion of their proceeds.
4. Such assets are held by him in trust to pay the debts of the testator and then to discharge legacies. Where, therefore, they are acquired from him by third parties, with knowledge of his trust and of his disregard of its obligations, they can be followed and recovered.
5. At the time of his death A. held in his name an interest in a commercial firm which he had acquired by funds belonging one-third to himself, one-third to the children of a deceased brother, and one-third to a sister. In his will, of which B., his brother, was appointed executor, A. made a request that the whole of such interest should be retained in the firm, under the control of B., so long as the latter should deem it profitable. His own interest he bequeathed to B., in trust for the latter and certain nephews and nieces, in equal proportions, to be held and controlled by B. so long as he should deem it advisable. One of the members of the firm having withdrawn therefrom, B. purchased his interest, whereupon the firm name was changed. Subsequently, to raise funds wherewith to pay loans made to the firm, B. pledged to C. certain notes which had come into his possession as executor. *Held*, 1. That, assuming the identity of the firm remained after the change of its members and name, the authority of B., as executor, to continue a specifically designated existing interest in the firm did not extend to the use in its business of any other funds or property of the estate. 2. That his use of the notes to raise funds for the firm was a misappropriation of them, and that C., having knowledge of the directions of the testator, cannot hold them against the claim of his representatives.

APPEALS from the Circuit Court of the United States for the Northern District of Illinois.

The facts are stated in the opinion of the court.

The first case was argued by *Mr. H. G. Miller* and *Mr. T. G. Frost* for the appellants, and by *Mr. W. C. Goudy* for the appellees.

The second case was argued by *Mr. H. G. Miller*, *Mr. T. G. Frost*, and *Mr. P. C. Smith* for the appellants, and by *Mr. C. C. Bonney* for the appellees.

MR. JUSTICE FIELD delivered the opinion of the court.

These are suits in equity to compel the delivery to the complainants of two promissory notes, each for $39,250, alleged to belong to the estate of Renick Huston, deceased, brought by the administrators *de bonis non* of that estate and the administrator *de bonis non* of the estate of Thomas T. Renick, deceased. They were commenced in a court of the State of Illinois, and upon application of the defendants, Ayer *et al.*, in the first case, and of the First National Bank of Westboro', Mass., in the second case, were transferred to the Circuit Court of the United States for the Northern District of Illinois. That court dismissed the bill in both cases, and from its decrees they are brought here on appeal.

The facts out of which the suits arise are substantially these: In February, 1864, one Renick Huston, then a resident of Ohio, died possessed of a tract of land, about eighty acres in extent, near Chicago, Ill. The legal title to the land stood in the name of Job R. Renick, but it is admitted that he held it as trustee for the estate of Huston, and to reimburse Thomas T. Renick for certain expenditures incurred on account of the property. The deceased left a will, by which, after making certain bequests, he devised one-third of the residue of his estate to Thomas T. Renick, whom he named as his executor, and to whom letters testamentary were issued. The property having been sold at different times for taxes, and being subject to various charges, Renick advanced money to a large amount, stated to be between twenty and thirty thousand dollars, to redeem it from the sales, and to pay off the claims upon it. He was authorized under the will to sell the real estate, and accordingly, in July, 1872, he sold it to one Joel D. Harvey for $157,000, payable one-fourth in cash and the balance in one, two, and three years, for which notes were given, secured by a trust-deed of the property executed to one J. Edwards Fay. There were six notes in all, three being each for $39,250, and the other three for the instalments of interest as they fell

due. They were all made payable to the order of Thomas T.
Renick individually. The cash payment was sufficient to re-
imburse him for his outlays, and he held the notes as executor
of Huston's estate.

In August, 1873, Thomas T. Renick died in Ohio, leaving
a will, and appointing his brother Benjamin executor of his
estate. Letters testamentary were accordingly issued to Benja-
min, and the notes of Harvey subsequently came into his pos-
session as executor. At the time of his death the deceased
held in his name an interest in a commercial firm, known as
Tower, Classen, & Co., engaged in the manufacture and sale
of chromatic printing-presses, at Canton, Ohio, which he had
acquired by funds belonging one-third to himself, one-third to
the children of a deceased brother, and one-third to a sister.
In his will he made a request that the whole interest should be
retained in the company, under the control of his brother, so
long as the latter should deem it profitable. His own interest
he bequeathed to his brother in trust for himself and certain
nephews and nieces mentioned, in equal proportions, to be held
and controlled by him so long as he should deem it advisable.
Several other bequests were made by the testator to different
parties, and the payment of an annuity to one of his brothers
was directed. Soon afterwards Benjamin purchased the inter-
est of Tower in the company, and then the firm name was
changed to that of B. T. Renick & Co.

In September, 1873, the complainants, Palmer C. Smith and
Job R. Renick, were appointed administrators *de bonis non* with
the will annexed of the estate of Huston. And when the sec-
ond note of Harvey was about maturing, application was made
to Smith, as such administrator, to consent to extend the time
of its payment and that of the third note. After some nego-
tiation, and the maturity of one of the notes, Smith signed an
agreement, in which, after reciting that the notes were the
property of the estate of Renick Huston, deceased; that a suit
was pending in Ohio affecting the property of the estate, and
that until its termination it was desirable that the money should
be invested; and that other parties — the West Chicago Land
Company, to which portions of the real property had been sold
— had assumed the payment of the notes and interest, he stipu-

lated not to press the payment of the notes until such time as he should require the money by reason of the termination of the suit, the extension in no event to exceed two years. This agreement bears date Sept. 12, 1874. The parties who had assumed the obligation to pay the notes were not content with the agreement without the signature of Benjamin Renick, executor of the estate of Thomas Renick, as the notes were in his possession and were payable to the order of his testator. After a good deal of negotiation, his signature, as executor of the estate of Thomas Renick, was obtained to a similar agreement for an extension of time, stipulating that he also would not press the payment of the notes unless he should require the money to make a settlement of that estate. It does not, however, contain the recital of the one signed by Smith, that the notes were the property of the estate of Huston. This agreement was not executed until the 19th of February, 1875, though it was dated back to the date of the one signed by Smith, and both agreements were placed in the hands of one James R. Goodman. On the same day the following indorsement was made on each of the notes : —

"FEB. 19, 1879.

"Payment of the within notes extended, as per contract of Sept. 12, 1874, now in the hands of James R. Goodman, Esq., for a period not exceeding two years from July 15, 1874.

"J. EDWARDS FAY, *Trustee, &c.*

"B. T. RENICK,

"*Executor and Trustee of Thomas T. Renick, deceased.*"

In May following, the firm of B. T. Renick & Co., the successors, as mentioned, of Tower, Classen, & Co., applied, through a broker in New York, to the defendants, J. C. Ayer & Co., of Lowell, Mass., for a loan of $39,250, and offered to pledge as collateral security for the money one of the notes of Joel A. Harvey, given upon the purchase of the land near Chicago, and secured by a trust-deed of the property. Ayer & Co. agreed to make the loan if the security was approved by their attorney, to whom it was referred to examine and report as to its sufficiency. The attorney made the examination. He testifies that he examined the two notes of Harvey and the deed of trust securing them, an abstract of title to the land, and a copy of the

will of Thomas' T. Renick; that he talked with the trustee under the trust-deed, and with Benjamin Renick, the executor of Thomas T. Renick, in whose possession the notes were at the time; that Benjamin informed him that he wished to use the money borrowed in the business of B. T. Renick & Co., manufacturers of chromatic printing-presses; that the establishment was the one designated in the will as that of Tower, Classen, & Co.; and that the notes had each the indorsement of the extension mentioned. The attorney reported to Ayer & Co. that the security was valid and sufficient to pay the notes, and advised them to take the note first maturing. Immediately afterwards he was directed to complete the loan. He accordingly took the note of B. T. Renick & Co. for $39,250, dated May 26, 1875, payable to Ayer & Co., at their office in Lowell, Mass., and, as collateral security, received the note first falling due of Harvey for the same amount, both of which he transmitted to Ayer & Co. It is to compel a surrender of this note to the complainants that the first of the above-named suits is brought.

In June following this transaction, the firm of B. T. Renick & Co. desired a further loan of $30,000, and employed J. Edwards Fay to obtain it on the security of the third note of Harvey for $39,250. Fay applied to the First National Bank of Westboro', Mass., for the loan. He showed to its officers the note of Harvey, having the indorsement extending the time of payment for a period not exceeding two years, pursuant to the agreement deposited with Goodman, and informed them of the trust-deed executed to him to secure its payment. The indorsement, as already seen, showed that the note was held by B. T. Renick as executor. He also told them of the loan made by Ayer & Co. upon the security of the second note, the examination then made by their attorney into the sufficiency of the security and his favorable report. He also mentioned the relation which Benjamin Renick, as executor of Thomas T. Renick, deceased, bore to the firm of B. T. Renick & Co., and that he made the application for the loan at the request of that firm. The bank thereupon agreed to make the loan. A note of B. T. Renick & Co., for $30,000, dated June 1, 1875, payable on the 15th of July, 1876, was accordingly executed and delivered to it, with the note of Harvey as collateral security, and the money

received.   It is to compel a surrender to the complainants of
the note thus pledged as collateral that the second of the above
suits is brought.   Soon after the bills were filed, Benjamin Ren-
ick resigned his position as executor of the estate of Thomas T.
Renick, and Edward J. Van Meter was appointed in his place
as administrator *de bonis non* with the will annexed, and by
leave of the court a supplemental bill was filed in both cases,
and he was allowed to appear in each as a co-complainant and
join in the prayer for relief.

There is no question as to the actual ownership of the notes
of Harvey taken by Ayer & Co. and the First National Bank
of Westboro'.   They belong to the estate of Renick Huston.
The only interest which Thomas T. Renick had in them grew
out of his relations to that estate for advances and services and
as a residuary legatee.   The question for determination is
whether Ayer & Co. and the bank took the notes under such
circumstances as to be able to hold them or either of them
against the demand of Huston's estate, or of that of the estate
of Thomas T. Renick, from whose executor they were received.
So far as the present suits are concerned, it is of no consequence
to the defendants whether the notes be regarded ultimately as
the property of the estate of Huston or of the estate of Thomas
T. Renick.   They can only insist that, as in their negotiations
they knew nothing of the claims of Huston's estate, and dealt
with the notes as the property of Renick's estate, they shall be
entitled to all the protection which that fact may confer.   We
shall so treat the cases and consider their rights.   There is no
doubt that Ayer & Co. relied entirely upon the judgment of
their attorney as to the power of the executor of the estate of
Thomas T. Renick to pledge the note for moneys borrowed to
be used in the business of the firm of B. T. Renick & Co.   Still
they must be held to know the law, and the limitations which
it prescribes to the powers of executors in the disposition of
property coming into their hands as such officers; and, however
free from intentional wrong, they must bear the responsibility
of a mistaken judgment with respect to those limitations.   The
facts brought to the knowledge of their attorney in his inquiries
respecting the note and the authority of Benjamin T. Renick
to pledge it are considered in law as brought to their knowledge.

Information to him of all essential matters affecting the subject he was investigating was in law information to them, and their action must be adjudged accordingly. The law, indeed, goes much further than this: it considers the principal as affected with notice of all facts, notice of which can be charged upon the attorney. Here the attorney examined the will of Thomas T. Renick; he knew that the note in question was held by Benjamin T. Renick in his character as executor of Thomas' estate, and not in his own right; the agreement referred to in its indorsement of extension of time of payment made him acquainted with that fact. It stipulated not to press for payment of the note until the money was required for the settlement of that estate; and he was informed beforehand that the money to be borrowed on the pledge of the note in question as security was to be used in the business of B. T. Renick & Co.

The Bank of Westboro' had no attorney of its own in the transaction. It relied upon the representations of the attorney of B. T. Renick & Co., employed to negotiate the loan. He informed the bank, however, of all facts essential to its knowledge, or acquainted it with such matters as upon inquiry would have given the information. It knew that the note was held by B. T. Renick as assets of Thomas T. Renick's estate, and not in his own right; it was so informed by the attorney; the indorsement on the note declared the fact also; and the agreement to which the indorsement referred, and to which its attention was called, would have removed all doubt on the subject, if any could have existed. It must be presumed to have known what it could thus easily have ascertained; and, dealing with an executor exercising his power of disposition of the personal assets of an estate in his hands, ostensibly to raise money, not for the estate or the settlement of its affairs, but for the business of a commercial firm, it was bound to look into his authority to make such a disposition of them, and is held to a knowledge of all the limitations which the will as well as the law put upon his power.

There is no doubt that, unless restrained by statute, an executor can dispose of the personal assets of his testator by sale or pledge for all purposes connected with the discharge of his duties under the will. And even where the sale or pledge is

made for other purposes, of which the purchaser or pledgee has no knowledge or notice, but takes the property in good faith, the transaction will be sustained; for the purchaser or pledgee is not bound to see to the disposition of the proceeds received. But the case is otherwise where the purchaser or pledgee has knowledge of the perversion of the property to other purposes than those of the estate, or the intended perversion of the proceeds. The executor, though holding the title to the personal assets, is not absolute owner of them. They are not liable for his debts, nor can he dispose of them by will. He holds them in trust to pay the debts of the deceased, and then to discharge his legacies; and, as in all other cases of trust, he is personally responsible for any breach of duty. And property thus held, acquired from him by third parties with knowledge of his trust and his disregard of its obligations, can be followed and recovered. The law exacts the most perfect good faith from all parties dealing with a trustee respecting trust property. Whoever takes it for an object other than the general purposes of the trust, or such as may reasonably be supposed to be within its scope, must look to the authority of the trustee, or he will act at his peril.

The adjudications in support of this doctrine are very numerous. The doctrine pervades the whole law of trusts. In *Colt* v. *Lasnier*, reported in 9th Cowen, Chief Justice Savage, of the Supreme Court of New York, after reviewing the cases, concludes that the correct rule both in England and in that State is, " That any person receiving from an executor the assets of his testator, knowing that this disposition of them is a violation of his duty, is to be adjudged as conniving with the executor, and that such person is responsible for the property thus received, either as purchaser or pledgee." And so in many cases it has been held that the payment by the executor of his own private debt with the assets of the testator is a *devastavit;* that is, a wasting of the estate. There are, indeed, some exceptions to this, as where the executor has paid debts of the testator with his own money to the value of the assets used. But, beyond a few exceptions of this kind, such a use of the assets is considered entirely indefensible, and the party receiving them will not be permitted to retain them, on the ground that the

transaction itself gives him notice of their misapplication, and thus necessarily involves him as a participator in the fraud. And the doctrine is supported by many authorities that where a party has reasonable grounds for believing that an executor intends to misapply them, or is in the very transaction converting them to private uses, such party can take no advantage from the transaction. In the case of *Miller* v. *Williamson*, the Court of Appeals of Maryland held that the fact that the executor made an assignment of such assets to secure a debt owing to parties by a mercantile firm of which he was a member, was sufficient, in contemplation of law, to notify them that he was about to commit a *devastavit*.  5 Md. 219.  And where an administrator had assigned promissory notes of the estate in his hands for goods for his own use, the Supreme Court of Indiana held that it was a waste of the assets; and that if the assignee had knowledge, even from the nature of the transaction, that the administrator was thus acting in violation of his trust, the right of property in the notes was not divested, and he could not hold the notes or profit by such assignment as against those rightfully entitled to them.  *Thomasson, Admr.*, v. *Brown*, 43 Ind. 203.  See also *Field* v. *Schieffelin*, 7 Johns. (N. Y.) Ch. 150, and *Petrie* v. *Clark*, 11 Serg. & R. (Pa.) 377.

In the cases at bar, the defendants Ayer & Co. and the directors of the bank knew that the pledging of the assets of the estate, of which Benjamin T. Renick was executor, to secure a loan for the business of a commercial house, was a misuse of them, unless, indeed, the will of his testator authorized it.  The law imputed such knowledge to them.  They could not say that such assets could be rightfully used as collateral security for loans to be employed in the business of a commercial house. It would be attributing to them the lack of ordinary good sense to suppose they entertained any such notion.  The question then arises, whether the will of Thomas T. Renick authorized the assets of his estate, or the moneys to be raised upon them, to be used in the business of B. T. Renick & Co.

In that will the testator mentions a certain interest in the firm of Tower, Classen, & Co., acquired by funds belonging to him, a sister, and the children of a deceased brother, and he desired that such interest should be continued in the firm, under

the control of his brother, so long as the latter should deem it profitable; and that his own share should be retained in like manner for certain parties, so long as he should deem it advisable; and he bequeathed it to him as trustee for that purpose. It did not authorize the use of any of the general assets of the testator in that business, or the borrowing of money on its account. It may, indeed, be doubted whether the new firm of B. T. Renick & Co. can be considered as the same firm as Tower, Classen, & Co. The change of the old firm by Tower's withdrawal may have taken from it the person upon whose judgment alone the testator relied for a wise management of its business. We cannot say that a confidence reposed in the firm which existed when the will was made would have been extended to another firm consisting of different associates. But, assuming that its identity remained after the change of members and name, it is perfectly clear that the authority of the executor to continue a specifically designated existing interest in the firm did not extend to the use in its business of any other funds of the estate, or to the use of any property which he received in his official character, to raise funds for that purpose. In *Burwell* v. *Mandeville's Executors*, reported in 2d Howard, this doctrine is stated by this court with great distinctness. There the testator and one Cawood had been partners, and in his will the testator desired that his interest in the partnership should be continued until the expiration of the term limited by the articles between them, the business to be continued by his partner, and the profit and loss to be distributed in the manner there provided. After his death, his partner carried on the business of the partnership, but failed before the expiration of the stipulated term; and the object of the suit was to reach the general assets of the estate of the testator to pay certain debts of the firm contracted after his decease. It was held that the general assets were not thus liable. The court observed that it was competent for partners to provide by agreement for the continuance of the partnership after the death of one of them; or for one partner by his will to provide for the continuance of the partnership after his death, and if it was consented to by the surviving partner, it would become obligatory. "But then," continues the court,

speaking through Mr. Justice Story, "in each case the agreement or authority must be clearly made out; and third persons, having notice of the death, are bound to inquire how far the agreement or authority to continue it extends, and what funds it binds; and if they trust the surviving party beyond the reach of such agreement, or authority, or fund, it is their own fault, and they have no right to complain that the law does not afford them any satisfactory redress. A testator, too, directing the continuance of a partnership, may, if he so choose, bind his general assets for all the debts of the partnership contracted after his death. But he may also limit his responsibility, either to the funds already embarked in the trade, or to any specific amount to be invested therein for that purpose; and then the creditors can resort to that fund or amount only, and not to the general assets of the testator's estate, although the partner, or executor, or other persons carrying on the trade may be personally responsible for all the debts contracted." And after citing several authorities from the English reports in support of these positions, the learned justice remarks, "That nothing but the most clear and unambiguous language, demonstrating in the most positive manner that the testator intends to make his general assets liable for all debts contracted in the continued trade after his death, and not merely to limit it to the funds embarked in that trade, would justify the court in arriving at such a conclusion from the manifest inconvenience thereof, and the utter impossibility of paying off the legacies bequeathed by the testator's will, or distributing the residue of his estate, without, in effect, saying at the same time that the payments may all be recalled if the trade should become unsuccessful or ruinous." *Ex parte Garland*, 10 Ves. Jr. 109; *Ex parte Richardson, &c.*, 3 Madd. 79; *Pitkin* v. *Pitkin*, 7 Conn. 306; *Lucht, Adm'r*, v. *Behrens*, 28 Ohio St. 231.

According to the doctrine of this case, — and many others to the same purport might be cited, — there is no authority in the will of Thomas T. Renick justifying the use of the general assets of his estate in the business of B. T. Renick & Co., even if this firm be identical with that of Tower, Classen, & Co. Applying the notes of Harvey held by his executor, or using them to obtain money for that purpose, was a misappropriation

of them, as much so as if they had been used for any other private business.   The parties receiving them, knowing of the directions of the testator, cannot hold them against the claim of his representatives.   The resignation of the executor who connived at this misappropriation having been accepted, and the administrator *de bonis non* with the will annexed having been appointed in his place, there is no objection to the prosecution of the suits in the latter's name, in conjunction with the representatives of Huston's estate, to compel the restoration of the notes.   And as the notes in fact belong to the estate of Huston, the administrators *de bonis non* of that estate may insist that, when they are returned by Ayer & Co. and the National Bank of Westboro', they shall be delivered over to them.

In what we have thus said of the misappropriation of the notes, we have assumed that they belonged to the estate of Thomas T. Renick; for the defendants Ayer & Co. and the Bank of Westboro' contend that they had a right to so treat them, as they were in the possession of his executor, claiming them as part of the assets of his testator.   But the want of authority on the part of the executor to pledge them is only the more marked from the fact that his testator only held them as executor for another estate, although that fact has not been allowed to affect the defence.

The decree in each case must, therefore, be reversed, and the court below directed to enter a decree, in the first case, that the defendants, Ayer & Co., surrender the note of Harvey taken by them to the complainants, the administrators *de bonis non* of the estate of Renick Huston; and that a like decree be entered in the second case against the First National Bank of Westboro', to surrender to the same complainants the other note of Harvey held by it, and that all other parties be enjoined from interfering with their collection of the said notes; and it is

                                                          *So ordered.*

NOTE. — A petition for a rehearing in the first case, and for a modification of the decree in the second case, having been filed, at a subsequent day of the term,

MR. JUSTICE FIELD delivered the opinion of the court.

· The petition for a rehearing in the first case, and the petition for a modification of the decree in the second case, are both denied.   The pledging of the notes

of Harvey, belonging to the estate of Renick Huston, or to the estate of Thomas T. Renick, — and for the purposes of these suits it matters not to which, as the representatives of both estates are parties complainant, — as security for moneys borrowed for the use of a mercantile firm, was a plain misappropriation of the property of one of the estates. Our decree was that the notes should be returned to the representative of the estate from which it was wrongfully taken. The defendants retain their claims against the firm of B. T. Renick & Co., on its notes, and can prosecute them before the ordinary tribunals; and if any members of the firm have interests in the estate of Renick Huston, or of other deceased parties, they can seek to subject those interests to the payment of the claims without prejudice from our decree in these cases.

*Petitions denied.*