**UNITED STATES of America, Plaintiff,**

v.

**Salvatore DIMUCCI, Robert Dimucci, and Anthony Dimucci, Defendants.**

**No. 84 C 8632.**

United States District Court, N.D. Illinois, E.D.

April 3, 1986.

**264**

Joan Laser, Asst. U.S. Atty., Chicago, Ill., for plaintiff. ·

Gerard C. Smetana, Arvey, Hodes, Costello & Burman, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

WILLIAM T. HART, District Judge.

On October 4, 1984, plaintiff filed this complaint alleging defendants were engaging in a pattern and practice of discrimination on the basis of race in violation of the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601 *et seq.* As relief plaintiff sought an order enjoining defendants from violating the Fair Housing Act in the rental of housing units. On October 16, 1985, this court struck defendants' pleadings and held each defendant in default for failure to comply with discovery requests and this court's orders. On October 25 plaintiff moved for entry of final default judgment and on November 1 defendants filed a motion under Fed.R.Civ.P. 55(c) to set aside the default with a supporting brief. On November 26 defendants, having hired new counsel, moved to stay the ruling on the default motions so the parties could attempt to settle this case. In this motion defendants claimed their former counsel had not informed them "of the seriousness of the Government's allegations regarding failure to respond to discovery requests."[1] That motion was granted but the case was not settled. This court ordered defendants' former counsel to file a response to defendants' claim that he did not keep them informed and the parties then filed another round of briefs.

## I. WHETHER ENTRY OF DEFAULT WAS JUSTIFIED

Though all made under Rule 55(c), some of defendants' arguments are really directed at the propriety of the entry of default; that is, defendants argue the October 16 entry of default was factually and legally mistaken.[2] Those arguments will be treated here as a motion for reconsideration. Before addressing those arguments a review of the procedural history of this case is necessary.

### A. Facts [3]

On January 17, 1985, plaintiff served defendant with its first interrogatories and first request for production of documents, seeking the name and address of every apartment complex defendants owned or managed; various information about the apartments, their managers and their occupants and potential occupants; and various information about how the apartments are managed (with the emphasis on how potential occupants are treated). Defendants neither responded nor objected within the required time. On March 19 (28 days late) defendants gave plaintiffs a set of leases for one of the four apartment complexes they owned but neither answered nor objected to any of the interrogatories or the remaining document requests. That same day defendants' counsel spoke with plaintiff's counsel on the telephone and acknowledged his response was incomplete but asked for certain documents from plaintiff

---

1. As will appear, the motions currently before the court are decided without the need to determine the adequacy of former counsel's efforts. Nothing in this opinion is meant to suggest any lack in that regard.

2. Though they have not pressed most of these arguments since retaining new counsel, defendants have not expressly repudiated them either and this court will therefore address all arguments defendants have raised.

3. The facts are set forth in detail in a declaration under penalty of perjury attached as appendix A to plaintiff's November 12 brief. This court sets forth only those facts essential to understanding the background of this case. With the exceptions discussed in the text, defendants do not dispute plaintiff's version of the facts.

before he finished responding. Plaintiff's counsel then sent defendants' counsel a letter agreeing to send the requested documents and requesting that defendants respond by March 25 or meet with plaintiff's counsel for a discovery conference. Defendants' counsel did not respond.

On March 26 this court held a status hearing at which defendants' counsel failed to appear. An order was entered directing defendants to respond to outstanding discovery within seven days. Defendants did not comply with that order.

Plaintiff then filed a motion for civil contempt which was addressed at the April 10 status hearing. Defendants were given an extension until April 22 to respond to outstanding discovery but were warned that if they failed to comply with the April 22 deadline this court would enter default judgment. On April 22 and 23 defendants answered some of the interrogatories and gave plaintiff some additional documents. In open court at the status hearing on May 2, defendants' counsel represented to the court and plaintiff's counsel that he would supplement his response to fully comply with the discovery requests by May 15, a date he later changed to May 20. On May 24, defendants' counsel delivered a supplemental response to the interrogatories.

Believing the response to be still incomplete, plaintiff filed a motion to compel and on June 5 this court ordered defendants to respond to all outstanding discovery by June 19 and set a status for the day after, June 20. Again, this court warned defendants that failure to respond to the discovery could result in default being entered. Defendants did not respond, and at the June 20 status this court entered yet another order directing defendants to answer certain interrogatories within seven days. Defendants then submitted a document titled "Final Response to United States' First Interrogatories." That response still did not disclose the names and addresses of those persons responsible for renting defendants' apartments or the applications for apartments.

Plaintiff then tried to get the desired information by serving a second set of interrogatories and document requests, this time seeking the identity of every person with knowledge of facts relating to the case, the identity of persons defendants might call as witnesses, and copies of documents defendants might use at trial. Defendants claim in their November 1 brief that their counsel orally informed plaintiff's counsel he did not expect to use any documents at trial but that if he did they would be those documents already produced, and that he did not then know what witnesses he might call. Plaintiff's counsel have filed affidavits denying they had any such communication from defendants' counsel. While normally reluctant to resolve such lawyer-lawyer conflicts, this court credits the affidavits of plaintiff's counsel over the unsworn claims in defendants' brief. Moreover, an oral response is not sufficient under Rule 33(a), and defendants provide *no* excuse for not responding to that part of the interrogatory seeking the identity of all persons with knowledge of the facts relating to this case.

Plaintiffs also sought the desired information through depositions of the current apartment managers and the president of the management company. Though unsuccessful in obtaining the information, plaintiff did learn that despite the fact that the management company was a corporation separate (on paper) from defendants, defendant Robert Dimucci prepared the payroll for the management company and was custodian of the payroll records.

Plaintiffs then served their third request for documents, seeking payroll records and anything else that would identify apartment managers. The request also again sought applications for apartments. Defendants responded by claiming the payroll and other records were in the possession of either Willow Management Company or SDM Realty Company. Nonetheless, some checks drawn on Willow Management Company were provided but, as the examples attached to plaintiff's response brief show, those checks disclosed no pertinent information (in part because the checks were

incompletely copied). Though the response stated records of SDM Company were included, none were. Defendants have since admitted (and the record shows) that they own SDM, which means they had legal control over any documents SDM had and were obligated to turn them over. *In re Folding Carton Antitrust Litigation,* 76 F.R.D. 420, 423 (N.D.Ill.1977). Defendants also admit that despite the existence of Willow Management Company they "control the operation of these apartment complexes" (December 5 brief at 6), and the record shows that one of the defendants controls the relevant documents allegedly held by Willow Management. The existence of these companies therefore provides no excuse for failing to supply the requested discovery. As to the request for apartment applications, defendants provided applications only from a limited time period for one of defendants' four apartment complexes.

Defendants claim they provided a supplement to their response to the third request for documents stating that not-yet-provided documents either do not exist or would be produced October 20. Plaintiffs deny receiving any such supplementary response, and in any event it does not appear that such production occurred.

Meanwhile, beginning September 4 plaintiffs had scheduled defendants' depositions. The depositions were postponed thrice at the request of defendants' lawyer. The first two postponements required extensions of the discovery closing date; the second such extension was granted for plaintiff only and this court made clear to plaintiff that if defendants failed to appear plaintiff should come to the court immediately for an order directing them to appear. Plaintiff agreed to the last postponement (to October 16) only after defendants' counsel agreed to several conditions, including an agreement by defendants to respond to the still-outstanding discovery by September 27. Plaintiff also made clear that it

would not agree to another postponement and defendants would have to address any request for further delay to the court. Defendants did not respond to the outstanding discovery by September 27 as agreed.

On October 9, plaintiff moved for civil contempt on the ground that defendants had still failed to provide information plaintiff regarded as critical that had first been sought by the January discovery requests. This court directed defendants to respond within one week and warned that if all responsive materials had not been produced the answer would be stricken and default entered.

On October 16 plaintiff's counsel were prepared to take defendants' depositions as previously scheduled. When defendants did not appear plaintiff's counsel telephoned defendants' counsel who stated defendants would not appear. That afternoon plaintiff appeared before this court with an emergency motion to compel defendants' attendance at their depositions. The motion stated that defendants did not contest the motion, were willing to appear October 28 and would pay all expenses plaintiff incurred due to defendants' failure to appear. This court asked defendants' counsel why defendants did not appear and was told they did not expect the depositions to go forward because they had not yet produced all the documents they had agreed to produce by September 27. This court stated that was no excuse, struck defendants' answer and entered a default order against each defendant.

### B. Discussion

 As this court was well aware on October 16, defendants' conduct supplied two independent bases for the entry of default. Five times (March 26, April 10, May 2,[4] June 5, and June 20) this court ordered defendants to respond to all outstanding discovery; five times defendants failed to comply. That disobedience justi-

---

**4.** No court order compelling discovery was entered on May 2, but defense counsel's promise in open court that he would comply with the outstanding discovery requests by May 15 is the

equivalent of an order. *Charter House Insurance Brokers v. New Hampshire Insurance,* 667 F.2d 600, 604 (7th Cir.1981).

fies a sanction under Rule 37(b)(2)(C).[5] Defendants argue they "substantially complied" with plaintiff's discovery requests (November 1 brief at 7) but that claim is totally belied by the record and in any event defendants certainly did not comply within the time deadlines repeatedly set and re-set by this court. Defendants' former counsel also argued they were doing the best they could to produce documents in the control of a non-party. Defendants appear to have abandoned this argument, at least in this precise form. See January 9, 1986 brief at 3, noting that "the time for arguing these positions has long passed." Even if not abandoned, the argument has no merit. As already noted, the material sought by plaintiff was, despite the legal existence of other entities, in the effective control of defendants. Therefore, this "technical" defense (see defendants' December 5 brief at 6) is no excuse.

■ Defendants also failed to appear for their properly-scheduled deposition on October 16. That total failure to respond justifies a sanction under Rule 37(d).[6] *See Fox v. Commissioner of Internal Revenue*, 718 F.2d 251, 254 (7th Cir.1983) (holding that the district court must "find a total failure to respond to the discovery requested").[7] Defendants again argue (or at least their former counsel did) they failed to appear for their deposition because they believed it would not take place until they provided a complete response to

plaintiff's document requests. That argument was rejected at the October 16 hearing and having reviewed the record this court rejects that argument again. Plaintiff's letter agreeing to the October 16 date flatly states plaintiff would not agree to any further postponement and any request therefor would have to be addressed to the court. Moreover, to take the depositions on October 16 plaintiff had to get an extension of the discovery cut-off, an extension this court granted only as to plaintiff and on the explicit understanding that if defendants failed to appear plaintiff should immediately come to court for an order compelling their appearance. No mention was made of document production as a prerequisite to the deposition going forward. Therefore, no reasonable person could have concluded in good faith that plaintiff did not intend to take the deposition as scheduled. It would also be inappropriate to excuse defendants' failure to appear on the basis of their own continuing failure to produce long-overdue documents.

■ Defendants also offer several legal challenges to entry of default. They claim sanctions for failure to appear at a deposition may not be imposed unless the court had ordered that appearance. However, a court order is only necessary where a deponent appears but refuses to be sworn and answer questions. Where the deponent literally fails to show up for a deposition "the

---

5. Rule 37(b)(2)(C) provides that

If a party ... fails to obey an order to provide or permit discovery ... the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

 * * * * * *

(C) An order ... rendering a judgment by default against the disobedient party.

6. Rule 37(d) provides that

If a party ... fails (1) to appear before the officer who is to take his deposition, after being served with a proper notice ... the court in which the action is pending on motion may make such orders in regard to the failure as are just, and among others it may take any action authorized under paragraphs (A), (B), and (C) of subdivision (b)(2) of this rule.

7. A quick reading of the quoted passage from *Fox* may suggest that a total failure to respond must also precede sanctions under Rule 37(b)(2). However, the cases on which *Fox* relies show that, as the wording of Rule 37 itself suggests, only Rule 37(*d*) contemplates a total failure to respond. *See, e.g., Fox v. Studebaker-Worthington, Inc.*, 516 F.2d 989, 994–95 (8th Cir.1975); *see also Stevens v. Greyhound Lines, Inc.*, 710 F.2d 1224, 1228 (7th Cir.1983) (discussing the distinction between subdivisions (b) and (d) of Rule 37). *Fox* does, however, preclude any reliance on defendants' total failure to respond in the required time to plaintiff's first discovery request on January 17. That failure to respond might have justified a sanction under Rule 37(d), but no motion was made before defendants made their first (incomplete) responses on March 19.

court may impose sanctions directly, without first issuing an order to compel discovery ...." *Stevens v. Greyhound Lines, Inc.*, 710 F.2d 1224, 1228 (7th Cir. 1983). Obviously, this case involves a literal failure to appear, so a court order directing defendants to attend their depositions was not a prerequisite to sanctions.

■ Defendants next argue that because no conference was held pursuant to Local Rule 12(d) before plaintiff sought default judgment, this court is without power to enter default. That reading is patently incorrect. Rule 12(d) applies to "any and all motions for discovery and production of documents;" it says nothing about sanctions. Moreover, a local rule certainly cannot abrogate the power given by the Federal Rules of Civil Procedure to sanction recalcitrant litigants.

■ Finally, defendants argue that even if sanctions are appropriate the ultimate sanction of default is not. Defendants claim "[d]ismissal is generally proper only where less drastic sanctions cannot substantially accomplish its purpose." *Searock v. Stripling*, 736 F.2d 650, 653 (11th Cir.1984). In this circuit, however, the sanction of default is appropriate "where there is a clear record of delay or contumacious conduct, *or* when other less drastic sanctions have proven unavailing." *Webber v. Eye Corp.*, 721 F.2d 1067, 1069 (7th Cir.1983) (emphasis added); *see also Ellingsworth v. Chrysler*, 665 F.2d 180, 185 (7th Cir.1981). Here, defendants' repeated refusal to comply with discovery and to obey court orders constitutes willful, bad faith and contumacious conduct that caused almost 10 months of unnecessary and prejudicial delay. Plaintiffs were not in any way harassing defendants with unnecessary and prejudicial discovery but were seeking material relevant and to some extent crucial to their case. Defendants' delay thus "seriously hampered" plaintiff's trial preparation. *Hindmon v. National-Ben Franklin Life Ins. Co.*, 677 F.2d 617, 621 (7th Cir.1982). Defendants were repeatedly warned that failure to cooperate would result in entry of default. No lesser sanction would have sufficed as a proper penalty for defendants' recalcitrance, to uphold the integrity of this court's orders, and to deter other would-be violators. *See National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976). Entry of default was thus proper both on the facts and under the legal standards.

## II. WHETHER ENTRY OF DEFAULT SHOULD BE VACATED

■ Rule 55(c) states that "[f]or good cause shown the court may set aside an entry of default...." "The elements required for relief under rule 55(c) are essentially the same as under rule 60(b), but the test is more liberally applied." *C.K.S. Engineers, Inc. v. White Mountain Gypsum Co.*, 726 F.2d 1202, 1206 (7th Cir.1984). Those elements are "(1) 'good cause' for the default, (2) 'quick action to correct it,' and (3) a 'meritorious defense' to the complaint." *United States v. One 1979 Rolls-Royce Corniche Convertible*, 770 F.2d 713, 716 (7th Cir.1985) (quoting *Breuer Electric Mfg. Co. v. Toronado Systems of America, Inc.*, 687 F.2d 182, 185 (7th Cir.1982)).

The only "good cause" defendants have presented for their actions is the alleged failure of their former counsel to keep them informed about the case. Defendants have filed affidavits claiming (1) they were never told what was going on at the various court hearings, (2) the only court documents they knew about were the interrogatories and document requests, and (3) the only aspect of the case they discussed with their former counsel was their desire that he vigorously contest the discovery requests and his insistence that they comply with those requests because otherwise they would be held in contempt. Their former counsel vigorously denies that he failed to keep them informed.

Reliance on the failings of a party's own attorney as good cause for a default was foreclosed by *Link v. Wabash Railroad Co.*, 370 U.S. 626, 633–34, 82 S.Ct. 1386, 1390–91, 8 L.Ed.2d 734 (1962), in which the Court stated:

There is certainly no merit to the contention that dismissal of petitioner's claim

because of his counsel's unexcused conduct imposes an unjust penalty on the client. Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have "notice of all facts, notice of which can be charged upon the attorney." *Smith v. Ayer,* 101 U.S. 320, 326 [25 L.Ed. 955].

That statement was made in an appeal from a dismissal under a court's inherent powers rather than under the present Rule 37, but as the quotation itself suggests, the principle is of general application. Nonetheless, as defendants point out, some lower courts have refused to hold a party responsible for his lawyer's failings where those failings result in default. *See, e.g., Jackson v. Beech,* 636 F.2d 831, 837 (D.C. Cir.1980). Until recently the Seventh Circuit had refused to take a position on this issue. *See Inryco, Inc. v. Metropolitan Engineering Co.,* 708 F.2d 1225, 1234 (7th Cir.), *cert. denied,* 464 U.S. 937, 104 S.Ct. 347, 78 L.Ed.2d 313 (1983); *Ben Sager Chemicals International, Inc. v. E. Targosz & Co.,* 560 F.2d 805, 810–11 (7th Cir. 1977). However, in *Tolliver v. Northrop Corp.,* 786 F.2d 316, 319 (7th Cir.1986), the court stated:

> Although [plaintiff] blames her lawyer for the failure [that led to dismissal], a litigant is bound by his lawyer's acts. *Link v. Wabash R.R.,* 370 U.S. 626, 633–34 [82 S.Ct. 1386, 1390–91, 8 L.Ed.2d 734] (1962); *Inryco, Inc. v. Metropolitan Engineering Co.,* 708 F.2d 1225, 1234 (7th Cir.), *cert. denied,* 464 U.S. 937 [104 S.Ct. 347, 78 L.Ed.2d 313] (1983). Holding the client responsible for the lawyer's deeds ensures that both clients and lawyers take care to comply. If the lawyer's neglect protected the client from ill consequences, neglect would become all too common. It would be a free good—the neglect would protect the client, and be-

cause the client would not suffer the lawyer would not suffer either. *See Boyle v. United States,* 710 F.2d 1251, 1257–58 (7th Cir.1983) (dissenting opinion), *reversed,* [469 U.S. 241] 105 S.Ct. 687 [83 L.Ed.2d 622] (1985). The court's power to dismiss a case is designed both to elicit action from the parties in the case at hand and to induce litigants and lawyers in other cases to adhere to timetables. *National Hockey League, supra* [427 U.S. at 643, 96 S.Ct. at 2781]. A court cannot lightly excuse a litigant because of the lawyer's neglect without abandoning the pursuit of these objectives. Tolliver does not suggest that supplying answers was not "within the meaningful control of the defaulting party, or its attorney." *C.K.S. Engineers, supra,* 726 F.2d at 1206. She says only that her attorney was asleep on the job.

As with *Link,* the context (appeal from denial of a Rule 60(b) motion to vacate dismissal) is slightly different but no principled distinction between that context and this exists. And while it might seem strange to cite *Inryco* in support of a conclusion that case expressly refused to reach, the quotation from *Tolliver* shows the statement "a litigant is bound by his lawyer's acts" was not offhand dicta but a squarely presented and considered holding. Therefore, this court is bound by that holding and defendants' "good cause" argument must fail.

Even if a lawyer's neglect *could* constitute good cause in some circumstances, defendants would still have failed to make the required showing. *Inryco,* after reviewing the case law, found that courts allowing relief because of a lawyer's misbehavior "uniformly require a diligent, conscientious client." 708 F.2d at 1234. That means the client must "follow the progress of the case" and "regularly inquire of their lawyer or the court as to the case's current status." *Id.* Given that requirement, it would seem a lawyer's failure to keep his client informed could *never* serve as "good cause" because the client has the duty to keep *himself* informed. In their affidavits defendants claim almost total ignorance of what was happening in the case. Salvatore

Dimucci discussed this case with his lawyer only about 8 times in the ten-month period; his brother defendants even fewer. They never asked their lawyer what was going on, nor do they claim he misled them [8]—indeed they admit he warned them that continued failure to comply with discovery would result in sanctions (though they claim he predicted contempt, not default, as the sanction, see Salvatore Dimucci's January 8 affidavit at 7). Salvatore Dimucci claims he repeatedly urged his counsel to "take strong defensive positions" (*id.* at 8) regarding discovery and that he was "terribly frustrated" (*id.* at 7) by his counsel's refusal to contest the discovery requests, but he very strangely never asked his counsel what was happening in court. Perhaps a lay person could believe discovery disputes often drag on for months with no activity by the judge, but Salvatore Dimucci is trained as a lawyer and defendants do not dispute plaintiff's claim (January 3, 1986 brief at 5) that they have been sued twice before for alleged Fair Housing Act violations. *See Hicks v. Cottonwood Management Corp.*, No. 82 C 6567 (N.D.Ill.); *Croom v. Dimucci Builders*, 79 C 1952 (N.D.Ill.). If their lawyer refused to present their position on the discovery request they should have taken steps to ensure that position would be timely presented. Finally, defendants do not state they inquired of this court or anyone else as to the status of the case. Therefore, it is clear defendants were not the diligent and conscientious clients courts have found deserving of protection from the failings of their lawyer.

It also must be noted that defendants' claims of ignorance are clearly contradicted by their former lawyer, who appears to have done his best to persuade them to comply with the court's orders. In his affidavit he states:

From the start [of my work in this case], I was instructed to deal principally with Mr. Salvatore Dimucci. I have never met Anthony Dimucci, but I have had a number of meetings and telephone conferences with Robert Dimucci. . . .

3. I have had numerous face to face visits and telephone conferences with Salvatore Dimucci related to the instant litigation. I cannot remember one which did not include extended, and sometimes heated, discussions on discovery issues. I have had some telephone conferences and several face to face visits at the Dimuccis' offices involving Mr. Robert Dimucci where again discovery matters were discussed.

4. During the course of my representation of the Dimuccis, I kept them fully informed of all matters related to the instant litigation. I made frequent telephone calls to Salvatore Dimucci both before and after all court appearances. All filings were made available to Mr. Dimucci during our face to face meetings. A number of filings he retained copies of. I, of course, immediately informed Mr. Dimucci of the contempt motions filed by the government. I went over with him, in detail, the charges made by the government and then went over in detail our response to the motions. At times, Mr. Dimucci would call to discuss arguments he had developed.

5. I had predicted for Mr. Dimucci the government's motions before they were filed. I told him repeatedly that the defendants would have to be more forthcoming with discovery than they had been. I told him if they were not, the government would seek sanctions, as it did.

6. On numerous occasions, in trying to obtain discovery materials, both information for the Interrogatory Responses and documents for the Production Requests, I argued with Mr. Dimucci over the importance of compliance and the consequences of failing to comply. At

---

**8.** Salvatore Dimucci does state he met with his former counsel sometime in the middle of 1985 to discuss "a charitable matter giving awards to architects, and the only mention of the case was that he said sometime during the meeting that everything was going fine." January 8 affidavit at 3. The affidavit does not indicate whether counsel's statement was in response to an inquiry, nor does it explain what was meant or understood by "everything". This vague and isolated incident thus does not appear to involve misrepresentation; it certainly cannot explain 10 months of failure to inquire about this case, if such is the fact.

every step Mr. Dimucci grudgingly gave me information and documents for disclosure to the government.

7. I informed Mr. Dimucci repeatedly of the Court's displeasure with the tardiness of defendant's responses. I told him on numerous occasions of the Court's threats to default the defendants if they failed to comply. I remember warning him that prolonged litigation over discovery matters might in time produce suspicion in the Court's minds [sic] concerning the defendants' good faith and openmindedness. Specifically, I warned Mr. Dimucci on several occasions former to the Court's default that the defendants might find themselves "just once too often" before the Court on discovery matters and that would be the last straw even though the reason for the appearance might be minor. This turned out to be the case.

8. On numerous occasions, I spoke with Mr. Salvatore Dimucci concerning the consequences of defendants' failure to comply with the government's reasonable requests for documents and information. I told Mr. Dimucci that if the defendants failed to comply with discovery, the court would default them. I went through this possibility with Mr. Dimucci many times. He is a lawyer and I am sure he understood. We discussed well before the Court's default what remedies the Court could enter against the defendants. I informed him that the government would seek to have a decree adopted similar to the one's [sic] entered by Judge Marshall in the *Busch* case and by Judge Parsons in *Century 21-Accent* case. I showed the decrees in these cases to Mr. Dimucci and he read them. Mr. Dimucci asked me on a number of occasions the likelihood of the Court entering such a decree on a default against him. I informed him that it probably would do what the government proposed but if the Court desired, it could do whatever it believed appropriate. The Court could be either more lenient or harsher than what the government proposed.

9. The area of the discovery which became the greatest block between the government and the defendants was disclosure of the identities of his former employees. Mr. Salvatore Dimucci categorically refused to provide any information which would lead to identifying his former employees. He would not even give this information to me so that I could interview them prior to disclosure. The defendants failure to provide documentary information related to former employees was a matter Mr. Dimucci and I discussed at length on numerous occasions before the Court's [entry of] default. I warned him more than once that failure to disclose the employee information would surely result in a default.

\* \* \* \* \* \*

11. In addition to the materials submitted in response to the government's last Motion for Contempt, I would also state regarding the scheduling of dates for defendants' depositions that I was in close contact with Salvatore Dimucci regarding all the dates set for his and his brothers' depositions. Mr. Dimucci was called prior to all scheduling so that he could consult his calendar. We had heated discussions concerning each date because Mr. Dimucci wanted on several occasions to put their depositions off until February, 1986 and I told him then I would not go back to the government with that long a continuance.

Finally, it is worth noting that defendants were *not* ignorant of the discovery requests in this case. They only claim they did not know of the efforts the government and this court were making to effect compliance. That kind of ignorance is no defense. Moreover, while defendants claim they were unaware of the October 16 deposition, their failures before that date independently require the sanction of default. *Cf. Hindmon, supra,* 677 F.2d at 621. Those failures caused the 10 months of delay, hampered plaintiff's preparation and undermined the authority of this court.

For all the foregoing reasons, defendants have failed to show "good cause" under Rule 55(c). Since a showing of good cause is independently necessary for Rule 55(c) relief, *see Passarella v. Hilton Interna-*

*tional Co.,* 108 F.R.D. 421, 424–25 (N.D.Ill. 1985), the other requirements need not be considered.

IT IS THEREFORE ORDERED that defendants' motion to vacate entry of default is denied, and plaintiff's motion for entry of default judgment is granted. The United States will serve and file with the court within 7 days of the date of this order a form of final decree and judgment and affidavit supporting default relief and serve defendants with copies thereof. This case is set for entry of the final judgment and decree on April 22, 1986 at 9:15 a.m.