855 So.2d 122 (2003)
Beatrice ROSE, Appellant,
v.
Michael W. FIEDLER, M.D., Charles M. Fischman, M.D., Fischman & Borgmeier, M.D., P.A., Omar David Hussamy, M.D., Omar D. Hussamy, M.D., P.A., and Coastal Orthopedic Center, Appellees.
No. 4D01-2856.
District Court of Appeal of Florida, Fourth District.
July 30, 2003.
Donald Alan Tobkin, and Richard A. Barnett of Richard A. Barnett, P.A., Hollywood, for appellant.
Jennifer S. Carroll and Diane F. Medley of the Law Offices of Jennifer S. Carroll, *123 P.A., Palm Beach Gardens, and Lewis W. Murphy of Moss, Henderson, Blanton, Lanier, Kretschmer & Murphy, P.A., Vero Beach, for appellees Charles M. Fischman, M.D., and Fischman & Borgmeier, M.D., P.A.
Robert D. Henry of Ringer, Henry, Buckley & Seacord, P.A., Orlando, for appellees Omar David Hussamy, M.D., Omar D. Hussamy, M.D., P.A., and Coastal Orthopedic Center.
STEVENSON, J.
Beatrice Rose, the plaintiff in a medical malpractice suit, suffered a directed verdict in favor of the defendant physicians as a sanction for her trial counsel's misbehavior during the course of the litigation and at trial. We find that the sanction of a directed verdict, tantamount to a dismissal of the case, was an inappropriate punishment of the litigant where the record does not support a finding that the client herself was personally involved in the attorney's misconduct. We reverse and remand for the trial court to consider other appropriate sanctions, short of dismissal.

The Proceedings Below
In June of 1995, Rose, who was in her sixties, underwent hip replacement surgery performed by Dr. Omar Hussamy, an orthopedic surgeon. Because of complications following the surgery, Rose filed a medical malpractice suit against a number of medical providers, but proceeded to trial against only Dr. Hassamy and Dr. Charles Fischman, the pulmonologist who treated her both before and after the surgery.
The difficulties between plaintiff's trial counsel, Donald Tobkin, and the defense attorneys began almost immediately and the pleadings, motions and hearing transcripts attendant thereto total more than 3,000 pages. The vast majority of the motions for sanctions, motions to compel, and motions for protective orders which followed were precipitated by Rose's counsel's failure to follow the rules of civil procedure and court orders. Some of the problems were caused by plaintiff's counsel's failure to follow simple rules of professional courtesy. For instance, the defense lawyers complained to the trial judge when Tobkin served a notice of deposition with no attempt to first coordinate the date with the defense, when Tobkin attempted to "piggy-back" his motions on hearings set by the defendants, and when Tobkin served one of the defendant doctors with a subpoena to appear at a "non-evidentiary" hearing. The bulk of the defendants' motions were granted. In one instance, the trial judge reserved jurisdiction to assess the amount of the sanction at a later date and, in a second, the court warned that future failures to comply could result in sanctions.
Besieged with motions and hearings resulting from the number of problems which arose between counsel during the pre-trial discovery period, the trial judge entered a case management order and also an order requiring a court reporter to be present at all hearings. Despite the case management order, the discovery motions continued with the trial court granting a motion to compel the plaintiff to answer interrogatories and reserving jurisdiction to award fees and costs.
By this time, it was September of 1998, more than a year after the filing of the complaint. Judge Smith recused himself when he became a patient of Dr. Fischman and Judge Kenney was assigned the case. The discovery motions to compel and for sanctions continued, most being filed by counsel for the defendants. In July of 1999, Judge Kenney intervened, but the problems continued.
Finally, on August 23, 1999, jury selection began. Following jury selection, a *124 discussion ensued between the judge and counsel regarding the pending motions in limine. Subsequently, the judge instructed counsel not to discuss in opening statements any matter that was the subject of a pending motion. About mid-way through his opening statements, Rose's attorney made statements to the jury regarding the "captain of the ship" doctrinethe subject of a pending motion in limine. The defendants moved for a mistrial and the court reserved ruling.
Following opening statements, the discussion turned to which witnesses Tobkin would call the next day. Tobkin indicated that he intended to read an edited version of Dr. Weiss's deposition. The defense counsel complained that Tobkin had not provided line and page numbers for Dr. Weiss's edited deposition despite the judge's pre-trial ruling that such information be exchanged; the court ordered Tobkin to provide it by 8 p.m. that evening. The next day, counsel for the defendants reported that Tobkin had not complied with the 8 p.m. deadline; instead, in the courtroom that morning, Tobkin provided attorney Murphy with the information regarding the Weiss deposition and attorney Henry with nothing at all. In response to all of this, the judge ruled that counsel would review Weiss's deposition over the lunch recess.
As it turned out, Tobkin never got to any of the deposition testimony on that day (August 25th). Instead, he called Dr. Hussamy to the stand. Tobkin questioned Hussamy for nearly a day and a half. Tobkin interrupted his questioning of Hussamy at one point to complain to the judge that the defense lawyers were making faces at the jurors; the judge instructed the attorneys not to make eye contact with any of the jurors.
Despite the trial judge's entreaties that the lawyers needed to help expedite the trial, when court reconvened the next morning, Tobkin resumed his examination of Dr. Hussamy, often posing redundant, unnecessary questions:
Q: Is skilled nursing facility a euphemism for a home?
[A relevancy objection here was overruled.]
A: Home to me is a place where somebody lives.
Q: Home is where the heart is?
A: Home is where you live.
Q: Home is where the heart is? How do the terms "home" and "nursing home" differ in your medical parlance?
A: Well, nursing home is a place or a home where you receive nursing and home is a place where you don't receive nursing; i.e., a home without nursing.
Q: A home is not a house, correct?
A: Well, one goes to one's home, which is a house; yes.
Q: A home is not a building, is it?
A: I think a home is a house. Yes, it is.
When the trial recessed for lunch and Tobkin still had not finished his examination of Dr. Hussamy, the trial judge asked the attorneys to consider how to address the problem of time as the jury had been told that the case would last seven to ten days, the courtroom had been booked for only ten days, and, near the end of the first week of trial, plaintiff's counsel was still conducting direct examination of the first substantive witness. After lunch, Tobkin questioned Hussamy for another twenty-two pages and then the defendants were permitted to call, out of order, Dr. Taher Husiany, a neurologist who saw Rose during her June 1995 hospitalization.
*125 When the proceedings recessed, the judge instructed counsel to get together over the weekend and resolve the problems with the remaining video depositions, particularly that of Dr. Coburn. When the lawyers returned on Monday morning, the defendants' attorneys reported that when Tobkin arrived for their meeting, he failed to bring the tapes with him and then left for half an hour to retrieve them. The judge then indicated that he had been reviewing Dr. Coburn's deposition and inquired what had become of the many objections. The defendants' attorneys represented that Tobkin had simply taken them out; Tobkin never answered, but stated that the defendants' attorneys should have brought the objections to the court's attention. After forty pages of discussion, the judge did not make a ruling, but instead brought the jury in so that the defendants' expert, Dr. Heidi Stephens, could be called to the stand.
After Dr. Stephens testified, Tobkin sought to show the jury Dr. Cordner's video deposition. The defendants' attorneys complained that Tobkin had just provided the page and line numbers that morning and that Tobkin had not indicated that he intended to offer Cordner's deposition that day. Difficulties also arose because the transcript began at page sixty-six. In light of this, the court inquired whether Tobkin had a live witness. Tobkin answered in the negative, stating that he had expected the court to approve Cordner's deposition and that he intended to call Mrs. Rose in the afternoon. This must have been the final straw for defendants' attorneys because, with that, they asked that the judge prohibit the plaintiff from presenting any further testimony and direct a verdict in their favor as a sanction for plaintiff's counsel's continued and repeated violation of the court's orders. The trial judge orally granted the motion, finding that plaintiff's counsel had consistently and egregiously violated the court's orders.
In the subsequent final judgment explaining its decision to impose the extreme sanction of dismissal, the trial court stated:
Plaintiff did everything possible to thwart a fair and orderly trial of this case. Everything was attempted by surprise.
. . . .
As a result, the totality of Plaintiff's continuous, intentional and egregious actions prevented Defendants from the possibility of receiving a fair trial and presenting their defense.
. . . .
... Despite numerous sanction orders, other orders where sanctions were reserved and other pending motions for sanctions, Plaintiff and her attorney continued to disregard almost every other order of this Court, the Rules of Civil Procedure and unwritten (but generally followed) principles concerning fairness.
. . . .
... Declaration of a mistrial with imposition of financial sanctions would not be a fair adjudication of those rights in this case, even if it were possible for the Court to calculate financial and professional losses to these Defendants, which the Court finds to be impossible. It is also important to remember the numerous prior and pending motions and orders reserving jurisdiction for imposition of financial sanctions, which did not deter what took place during this case.
. . . .

[The Court went on to describe the significant problems in judicial administration *126 caused due to the fact that he was specially assigned to the case and most of the hearings were in St. Lucie County and the trial was held in Indian River County.]

. . . .
The Court is also convinced that Plaintiff would like nothing better than a declaration of mistrial in this case, even if it were accompanied with some sanctions. She would be given a "second bite at the apple" and the ability to correct all previous mistakes. Defendants complied with the orders of this Court and Plaintiff did not. It would be unduly prejudicial to put Defendants through this again.

Kozel's Six-Factor Test
Appellant argues that dismissal was too severe a sanction. Our resolution of this issue begins with the decision in Kozel v. Ostendorf, 629 So.2d 817, 818 (Fla.1993). In Kozel, our supreme court addressed a situation where the attorney for the plaintiff failed to file an amended complaint within the time parameters ordered by the trial court. The trial judge dismissed the case with prejudice as a result. On review by the supreme court based on conflict jurisdiction,[1] the court mandated that the order of dismissal be reversed:
In the instant case, the trial court acted within the boundaries of the law. In our view, though, the court's decision to dismiss the case based solely on the attorney's neglect unduly punishes the litigant and espouses a policy that this Court does not wish to promote. The purpose of the Florida Rules of Civil Procedure is to encourage the orderly movement of litigation. Fla. R. Civ. Pro. 1.010. This purpose usually can be accomplished by the imposition of a sanction that is less harsh than dismissal and that is directed toward the person responsible for the delayed filing of the complaint.
. . . .
Because dismissal is the ultimate sanction in the adversarial system, it should be reserved for those aggravating circumstances in which a lesser sanction would fail to achieve a just result.
Id. at 818 (citations omitted)(emphasis added).
The court in Kozel went on to require that the trial judge reconsider the sanction in light of the six-factor test established in the opinion, i.e.,
1) whether the attorney's disobedience was willful, deliberate, or contumacious, rather than an act of neglect or inexperience; 2) whether the attorney has been previously sanctioned; 3) whether the client was personally involved in the act of disobedience; 4) whether the delay prejudiced the opposing party through undue expense, loss of evidence, or in some other fashion; 5) whether the attorney offered reasonable justification for noncompliance; and 6) whether the delay created significant problems of judicial administration.
Id. The court stated that "[u]pon consideration of these factors, if a sanction less severe than dismissal with prejudice appears to be a viable alternative, the trial court should employ such an alternative." Id.
Here, review of the record and the trial court's detailed order demonstrates that all of the factors discussed in Kozel, except *127 for one, weigh heavily in favor of dismissal. Tobkin's disobedience was willful, deliberate and contumacious (factor 1); Tobkin had been previously sanctioned (factor 2); Tobkin's conduct caused prejudice to the opposing side through undue expense (factor 4); Tobkin offered no reasonable justification for non-compliance (factor 5); and the delay created significant problems of judicial administration (factor 6).
The record on appeal, however, does not support a finding that Rose herself participated in the misconduct or that she was aware in any real sense of the nature or extent of her attorney's mis-doings; indeed, the record suggests that Rose was in the hospital during much of the trial. Thus, a consideration of Kozel's factor 3, whether the client was personally involved in the act of disobedience, does not support dismissal. Given our supreme court's express purpose in Kozel not to promote a policy of dismissing cases because of lawyer disobedience without the client's involvement, the inclusion of that factor within the court's six-part test appears to establish an indispensable foundation for dismissal. Moreover, the court in Kozel seemed particularly concerned that, as in the instant case, the client was unaware that the case was on the brink of dismissal:
Granted, the plaintiff is aware of the filing deadlines and is responsible for the action that she initiates. Nevertheless, dismissal is an unusually harsh sanction when neither the court nor the defendant is required to notify the plaintiff that dismissal is pending.
Id. at 818 n. 2.
Indeed, in Schlitt v. Currier, 763 So.2d 491 (Fla. 4th DCA 2000), this court held that absent client participation in the misconduct, Kozel precluded the entry of judgment in favor of the adverse party. In Schlitt, the defendant filed a total of thirteen motions to compel as the result of the plaintiff's failure to respond to discovery requests and orders setting deadlines for responsive pleadings. Monetary sanctions were entered three times and dismissal was threatened on a number of occasions. Finally, the trial court struck the complaint and entered judgment in favor of the defendants.
After his complaint had been dismissed, Schlitt hired new counsel and sought to vacate the sanctions, attaching an affidavit to the effect that he was unaware of the numerous motions and sanctions. See 763 So.2d at 492. The trial court denied the motion to vacate. On appeal, this court reversed:
In this case, the lengthy history of total non-compliance with numerous court orders to comply with pre-trial discovery would seemingly justify the trial court's ultimate sanction. Moreover, Schlitt does not dispute that his attorney's conduct was inexcusable.
Nevertheless, we reverse, as this court has interpreted Kozel as mandating reversal of such extreme sanctions, as an abuse of discretion, where the actions were the fault of the attorney and not the party. See Cole v. Bayley Prods., Inc., 661 So.2d 1299 (Fla. 4th DCA 1995); accord Elder v. Norton, 711 So.2d 586 (Fla. 2d DCA 1998); Walicki v. Waste Management, Inc., 703 So.2d 1095 (Fla. 2d DCA 1997). Here, Schlitt presented an affidavit swearing to complete ignorance of his attorney's actions.
Id. at 493 (emphasis added).
Just as in Schlitt, Kozel requires a reversal of the dismissal sanction in this case. Accordingly, in the instant case, having found no evidence of client knowledge or involvement in the attorney misconduct, we reverse the dismissal and remand so that the trial court may consider other appropriate sanctions.
*128 Yet, we recognize that, in Kozel, the attorney malfeasance was more in the nature of neglect than disobedience. Here, the trial court found that the attorney's misconduct was "willful, deliberate and contemptuous." Further, the trial judge painstakingly described the prejudice resulting to the opposing side and outlined why any sanction short of dismissal would not be a viable alternative. These distinctions cause this court to question whether Kozel's express desire to discourage the dismissal of lawsuits absent client involvement in the misconduct sanctioned would extend to the circumstances here. Accordingly, we certify the following question to the Florida Supreme Court as one of great importance:
MAY A TRIAL COURT DISMISS A CIVIL ACTION AS THE RESULT OF THE PLAINTIFF'S ATTORNEY'S MISCONDUCT DURING THE COURSE OF THE LITIGATION WHERE A CONSIDERATION OF ALL OF THE KOZEL FACTORS POINT TO DISMISSAL EXCEPT THAT THERE IS NO EVIDENCE THAT THE CLIENT WAS PERSONALLY INVOLVED IN THE ACT OF DISOBEDIENCE?
REVERSED and REMANDED.
TAYLOR, J., concurs.
WARNER, J., concurs specially with opinion.
WARNER, J., concurring specially.
I concur only because of Schlitt, which held that Kozel precludes dismissal for attorney misconduct unless it is shown that the client participated in the misconduct. 763 So.2d at 493. As in Kozel, Schlitt involved delays in responding to discovery or amending pleadings, id. at 492, not willful, contumacious trial conduct by the attorney as in this case. Moreover, Kozel listed six factors for the court to consider in determining the sanction to be applied, of which client involvement was only one factor. 629 So.2d at 818. Schlitt has turned Kozel into a five factor test plus one super factor as a condition precedent to the consideration of the other factors.
In this case, the court detailed at length the grievous conduct of the attorney both prior to, and during, trial. The court's order recited that "this case presents a unique combination of a party (Ms. Rose) and her attorney (Mr. Tobkin) continuing a course of willful, deliberate and contemptuous misconduct, without any reasonable justification or excuse." There is scant evidence in the record of actual knowledge of the client, despite her failure to obey the court's orders to attend a summary trial and to answer supplemental interrogatories or her failure to appear at trial. Her attorney explained that she was sick but that was apparently never confirmed on the record. I could locate only one excerpt of her deposition in the voluminous record. At that deposition her attorney and defense counsel bickered and argued over the continuation of the deposition. It is apparent on one occasion that her attorney agreed to a continuation of the deposition but later reneged on the agreement in her presence. Just by listening to this heated exchange, she should have known of her attorney's antics in this case.
The trial court also determined that no sanction short of dismissal would be a viable alternative. Unlike the situation in Kozel or Schlitt where the cases were only in the discovery stage, see Kozel, 629 So.2d at 817; Schlitt, 763 So.2d at 492, here, the trial had commenced and was ongoing for several days, with the judge attempting to avert the difficulties that the plaintiff's attorney was creating. Finally, the court determined that nothing short of dismissal with prejudice would suffice to correct the *129 problems. Given his level of disobedience, the court could not expect the attorney's conduct to improve at a second trial. Moreover, the use of an alternative sanction, such as a mistrial with an assessment of attorney's fees and costs against the plaintiff and her attorney as a condition to resetting the trial, probably would be tantamount to dismissal with prejudice as a sanction, unless either the client or the lawyer had the ability to pay what would obviously be a very substantial award.
Were it not for Schlitt, I would affirm the trial court's ruling. Kozel does not command that a case may never be dismissed for attorney misconduct without client participation being shown. 629 So.2d at 818. Client participation may be one factor, but the trial court needs the discretion in egregious cases as this one to utilize the ultimate sanction of dismissal, even where the client does not actually participate in the misconduct. The United States Supreme Court has itself authorized such a result. In Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership, 507 U.S. 380, 396-97, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993), the Court said:
[W]e have held that clients must be held accountable for the acts and omissions of their attorneys. In Link v. Wabash R. Co., 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962), we held that a client may be made to suffer the consequence of dismissal of its lawsuit because of its attorney's failure to attend a scheduled pretrial conference. In so concluding, we found "no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client." Id., at 633, 82 S.Ct. at 1390. To the contrary, the Court wrote:
"Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have `notice of all facts, notice of which can be charged upon the attorney.' " Id., at 633-634, 82 S.Ct. at 1390 (quoting Smith v. Ayer, 101 U.S. 320, 326, 25 L.Ed. 955 (1880)).
This principle also underlies our decision in United States v. Boyle, 469 U.S. 241, 105 S.Ct. 687, 83 L.Ed.2d 622 (1985), that a client could be penalized for counsel's tardy filing of a tax return. This principle applies with equal force here and requires that respondents be held accountable for the acts and omissions of their chosen counsel.
Here, the gross misconduct of the attorney permeated the entire case, culminating at trial. The court attempted prior solutions and gave many warnings and some sanctions. Faced with this exceptionally contumacious conduct at trial and direct disobedience to several trial rulings, I think the court acted well within its discretion in dismissing this case with prejudice. A mistrial and retrial would not cure the problem, including the additional publicity generated against the defendants and the financial losses they suffered, as noted by the trial court.
The client cannot claim ignorance and then get another opportunity. She hired this attorney and then allowed him to obstruct and obfuscate for over three years. She must take some responsibility to inform herself of her affairs, including this suit. If she in fact suffers as a result of her attorney's egregious behavior, it is a result of her own choice to hire him and then remain uninformed and apparently uninterested *130 in the manner in which he represented her.
NOTES
[1] The court reviewed Kozel v. Ostendorf, 603 So.2d 602 (Fla. 2d DCA 1992), which conflicted with Clay v. City of Margate, 546 So.2d 434 (Fla. 4th DCA), review denied, 553 So.2d 1164 (Fla.1989). The court quashed the Second District's opinion in Kozel.